**Dorothy L. GOODWIN, Individually and as Next Friend of Bryan C. Goodwin, et al., Plaintiffs,**

v.

**CROSS COUNTY SCHOOL DISTRICT NO. 7 et al., Defendants.**

No. H 72–C–25.

United States District Court,
E. D. Arkansas, E. D.

Sept. 11, 1973.

Morton Gitelman, Fayetteville, Ark., Theodore L. Lamb, Little Rock, Ark., for plaintiffs.

Eugene R. Warren, Warren & Bullion, Little Rock, Ark., Shaver & Shaver, Wynne, Ark., for defendants.

OREN HARRIS, District Judge.

By this action the plaintiffs seek to restrain the defendants from permitting, authorizing and condoning sectarian religious practices at and within the Cross County School District No. 7, Cross County, Arkansas. The plaintiffs invoke the jurisdiction of this Court pursuant to the First and Fourteenth Amendments to the Constitution of the United States; 28 U.S.C.A. § 1343; and 42 U.S.C.A. § 1983.

The plaintiffs seek relief by way of declaratory judgment as provided by 28 U.S.C.A. §§ 2201 and 2202, in declaring the rights, privileges and immunities, together with the legal relations of the parties subject to the controversy, in that the policy, custom, usage, and practice of defendants permitting sectarian religious practices in the schools under and within their control is in violation of their constitutional rights and should be declared void.

The plaintiffs are citizens of the United States of America and the State of Arkansas and are residents of Cross County, Arkansas. The plaintiff, Dorothy L. Goodwin, is the mother of plaintiffs, Bryan C. Goodwin, Kimberly N. Goodwin, and Rena R. Goodwin, minors duly enrolled in the schools under and within the control of Cross County School District No. 7.

The defendant, Cross County School District No. 7, is a duly authorized and acting School District under the laws of the State of Arkansas and engaged in providing education of students who reside within the District through the facilities and with personnel of the School District in accordance with the laws of the State with the aid of public funds derived from taxes assessed and collected within the District, the County and the State of Arkansas. The individual defendants are residents of the United States of America and the State of Arkansas and residents of Cross County, Arkansas. The defendants, D. H. Vaught, Harold Rowland, Carl Lace, Merle Goodart, Jerry Lovrien and Norman Halk, are members of the Board of Directors of Cross County School District No. 7, duly elected and serving pursuant to the laws of the State of Arkansas. The defendant, G. Cooper, is Superintendent of Schools, and in this capacity is duly elected by the School Board to supervise the operation, maintenance, and actions of the School District in providing education for the students eligible to attend the District's public schools.

The plaintiffs contend that the defendants and their agents and employees have, in the past, authorized and continue to authorize and condone sectarian religious practices within the schools under their control and supervision. It is alleged, by the plaintiffs, that

(1) Ministers of religion from the community churches are periodically invited to the District schools to address various classes within the schoolroom and, on occasions, the minister requests the children to indicate, as a part of the presentation, if they attend church and, also, to indicate if they were "saved",

(2) In some instances the teacher requires the children to commit to memory a prayer that they recite each day before lunch, and in some cases the children read from the Bible each day as part of the opening routine, and

(3) The Gideon Society, a sectarian organization, is regularly invited into the schools for the purpose of distributing a sectarian religious book, generally referred to as the Gideon Bible and representatives of the organization are permitted to give illustrated talks to the children on their Bible and its worldwide distribution.

As a part of the defendant School District's program, each school day is commenced by a member of the Student Council reading the Lord's Prayer and a selected Bible verse over the school's intercom system. In some instances, the teacher leads the class in prayer.

The plaintiffs further contend that the School Board, through its agents and employees, authorize and condone sectarian religious baccalaureate programs on the school premises in conjunction with commencement exercises.

The plaintiffs have exhausted all available administrative remedies in connection with the practices alleged herein and have no plain, adequate, nor complete remedy to redress the wrongs and illegal acts complained of other than through this method for a declaration of rights that the practices complained of are offensive to the religious beliefs of the plaintiffs and thus prohibits the free exercise of their religion in contravention of their constitutional rights.

The plaintiffs allege that the defendants have established and are maintaining, under color of the laws of the State of Arkansas, a policy, custom and usage, contrary to the First Amendment of the Constitution of the United States, as made applicable by the Fourteenth Amendment to the Constitution of the United States.

The defendants have responded to the allegations of the plaintiffs in which the jurisdiction of this Court and the residence and citizenship of the parties are admitted. The defendants deny generally other allegations of the plaintiffs' Complaint.

The defendants contend that the School Board has developed and ap-

proved written policies concerning teacher and pupil relationships which include that the teacher shall avoid religious and political indoctrination of pupils. Further, it is contended, by the School Board, that the School District maintains a policy to the effect that no action will be taken which would either require or prohibit religious activities on the part of the pupils in their District.

Further, the defendants admit that ministers of the various churches are occasionally invited to their schools to address the students. This is authorized and permitted, as part of the School Board policy, to involve the entire community in the Cross County School System. This policy, they contend, includes persons invited who are engaged in other vocations and professions, all forming the local business community.

The defendants further admit that, in some cases, children are permitted to select passages from the Bible and to read them, but without comment or religious explanation.

The defendants also admit that representatives of the Gideon Society have been permitted to visit the schools and to distribute their Bible to those students who wished it. Also, the defendants admit that members of the Gideon Society have been permitted to present talks to the students of the school. However, this is permitted by the school in order for the Gideon Society to explain the purpose and work of the Society to the students.

The defendants further admit that each day prior to the beginning of classes a member of the Student Council is permitted to read, over the intercom system of the High School, a selected Bible verse, selected by the committee of the Student Council without any advice or assistance of the faculty or administration of the school and, also, permit the presentation of the Lord's Prayer.

It is also admitted by the defendants that it is a custom and practice of the School District to include, as a part of the graduation exercises of the senior class, a baccalaureate service sponsored by the class. It is contended, by the District, that there is no regulation by the school requiring attendance and no threats or inducements are made for such attendance.

After joining of the issues in the case as referred to herein, the plaintiffs filed a Motion for judgment on the pleadings, or summary judgment, pursuant to the rules. The Motion is supported by a brief filed by counsel on the part of the plaintiffs.

The defendants have filed a response to the Motion for judgment on the pleadings, or summary judgment, contending that the action contains highly controversial questions of fact. In resisting the plaintiffs' Motion, the defendants filed memorandum brief in support of their contention.

Pursuant to a regular scheduled hearing, counsel for the parties agreed they would enter into a stipulation of the facts and submit the case on stipulation and briefs. Subsequently, a stipulation was entered into by counsel and filed December 18, 1972.

As provided in the stipulation, there are four basic issues for the Court's determination, which are:

(1) The validity of Bible reading and reciting of the Lord's Prayer at the Cross County High School,

(2) The baccalaureate services in connection with the graduation exercises at the Cross County High School,

(3) The distribution of Gideon Bibles at Cherry Valley Elementary School, and

(4) School Board Policies on religious practices.

With reference to the first question, Bible reading and prayers permitted at the Cross County High School, it is stipulated as follows:

"*School Prayer at Cross County High School.* Around the middle of the 1971–72 school year the Student Council President, on behalf of the Student Council, asked the high school princi-

pal, Fred Lamb, if the Student Council could read Bible verses and recite the Lord's Prayer over the school intercom. The principal, Mr. Lamb, after discussing the request with Grover Cooper, superintendent, granted permission to read Bible verses and recite the Lord's Prayer from 8:25 to 8:30 A.M., when the daily announcements are usually made.

A member of tthe Student Council selects a Bible verse daily, to be read with Lord's Prayer over the school intercom; the reading is performed by a member of the Student Council. The daily opening routine at the school is as follows:

8:20 A.M.—First bell rings; students enter the school building;

8:25 A.M.—Second bell rings; students are *expected* to be in their classrooms; intercom becomes operative and announcements and prayers are read;

8:30 A.M.—Tardy bell rings, roll call is taken, and classes begin; students are marked late if not in their classrooms at this time.

Employees of the school district do not participate in the selection or reading of Bible verses or recitation of the Lord's Prayer. The Bible reading and prayer on the average consumes 1½ to 2 minutes."

As to the second question, it is stipulated as follows:

*"Baccalaureate Services at Cross County High School.* The Baccalaureate services are held in the auditorium of Cross County High School. The speaker is usually a minister of one of the local churches in the district. The speaker is selected by nomination and election by the members of the senior class. Attendance at the Baccalaureate service is voluntary; no student is penalized for failure to attend. The services are not held on school days nor during the time when classes are being held."

As to the third question, the stipulation of the parties provides:

*"Bible Distribution at Cherry Valley Elementary School.* A representative of the Gideon Society comes to each elementary school in the district each year; the visit is initiated by the Gideon Society and not by the school administration. The Gideon representative visits the fifth grade classes. A small, pocket size, partial Bible, containing the King James version of the New Testament, Book of Psalms, Book of Proverbs, and a picture of the American flag is given to students who indicate their desire for such Bible. The students are not required to accept the book. A King James version of the New Testament is given to each teacher who will accept same. Some Gideon Society representatives explain to the students where the Gideon Society distributes partial Bibles and the activities of the Gideon Society; other representatives confine themselves to simply distributing the Gideon Bibles."

Finally, it is stipulated as follows:

*"School Board Policies.* Cross County School District No. 7 has in existence the following Policies, Rules, and Regulations pertinent to the issues in this case:

1. Teachers should avoid religious and political indoctrination of pupils.

2. The Cross County School District #7 School Board should not take any action which would either require or prohibit religious activities on the part of the pupils in Cross County School District #7."

Under the Constitution of the State of Arkansas, it is provided that the State shall ever maintain a general, suitable and efficient system of free schools, whereby all persons in the State between the ages of six and twenty-one years may receive gratuitous instruction. Further, the Constitution provides that no money or property belonging to the public school fund, or to this State for the benefit of

schools or universities, shall ever be used for any other than the respective purposes to which it belongs. Constitution of Arkansas, Article XIV, Sections 1 and 2.

The Constitution of Arkansas further provides that the General Assembly shall provide for the support of common schools by general law, including an annual per capita tax of one dollar, to be assessed on every male inhabitant of the State over the age of twenty-one years; and the school districts are authorized to levy by a vote of the qualified electors respectively thereof an annual tax for the maintenance of schools. Arkansas Constitution, Article XIV, Section 3.

Pursuant to the provisions of the Arkansas Constitution, the General Assembly of Arkansas has provided for the establishment, maintenance and operation of a public school system for all students within the State of Arkansas between the ages of six and twenty-one years. Ark.Stat.Anno. § 80–101 et. seq.

The General Assembly of Arkansas has provided, inter alia, for the establishment of school districts, as a body corporate with powers and duties, to maintain a general, suitable and efficient system of free schools supported by public school funds from taxation and other sources through a Board of Directors of the respective school districts. Public education for students is provided with authority of the school board, to determine the policies of the district, pursuant to the laws of the State of Arkansas and to maintain and operate the public schools through agents, officers, and employees. Ark.Stat.Anno. § 80–501 et seq.

In addition to education through the public schools being provided for all persons between the ages of six and twenty-one years, residing in the respective districts, attendance of all students between the ages of seven and fifteen years is required. Ark.Stat.Anno. § 80–1502. Parents, guardians, or other persons, having custody or charge of any child, who violate this law, commit a misdemeanor punishable by fine unless the children attend private or parochial schools which meet educational standards fixed by the State. Ark.Stat.Anno. § 80–1508.

Jurisdiction is well established through a long line of cases decided by the United States Supreme Court, from Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) to Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), wherein religious practices, as permitted in the public schools, were challenged as contrary to the Constitution of the United States.

The Supreme Court stated in Abington, supra, at page 215; 83 S.Ct. at page 1569:

"[t]his Court has decisively settled that the First Amendment's mandate that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof' has been made wholly applicable to the States by the Fourteenth Amendment. Twenty-three years ago in Cantwell v. Connecticut, 310 U.S. 296, 303 [60 S.Ct 900, 903, 84 L.Ed. 1213] (1940), this Court through Mr. Justice Roberts, said:

'The fundamental concept of liberty embodied in that [Fourteenth] Amendment embraces the liberties guaranteeed by the First Amendment. The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws. . . .'

In a series of cases since Cantwell the Court has repeatedly reaffirmed that doctrine, and we do so now. Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 108 [63 S.Ct. 870, 872, 87 L.Ed. 1292] (1943); Everson v. Board of Education, [330 U.S. 1,

67 S.Ct. 504, 91 L.Ed. 711] supra; Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 210–211 [68 S.Ct. 461, 464–465, 92 L.Ed. 648] (1948); Zorach v. Clauson, [343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954] supra; McGowan v. Maryland, 366 U.S. 420 [81 S.Ct. 1101, 6 L.Ed.2d 393] (1961); Torcaso v. Watkins, 367 U.S. 488 [81 S.Ct. 1680, 6 L.Ed.2d 982] (1961); and Engel v. Vitale, [370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601] supra."

■ It is also well established that the plaintiffs have standing to complain of the practices here challenged. The children, as parties to this action, are students in the public schools of the defendant school district. They and their mother, individually and as next friend, are directly affected by the practices against which their complaints are directed. Abington School District v. Schempp, supra; McCollum v. Board of Education, supra; Everson v. Board of Education, 330 U.S. 1.

In Abington School District v. Schempp, supra, at page 211, the Supreme Court enunciated the rule in case No. 119. There, as in the instant case, the question involved religious practices in the public schools pursuant to action taken by the school board. Such action by the Board was taken pursuant to the Statute of Maryland granting broad general and discretionary powers to the school board for the performance of the Board's duties and responsibilities in providing for the education for the students within the District.[1]

■ The policy or practice in the Maryland school, as in the instant case, provided for the holding of opening exercises within the public schools of the City of Baltimore consisting primarily of reading, without comment, of verses from the Holy Bible and the use of the Lord's Prayer. The fact that the prac-

tices permitted, in this proceeding, were performed through the auspices of the Student Council, is begging the issue. It is stipulated that the principal of the school, after discussing the matter with the superintendent, granted permission that a member of the Student Council may read Bible verses and recite the Lord's Prayer from 8:25 A.M. to 8:30 A.M. when the daily announcements are usually made. The Bible verses read, and recitation of the Lord's Prayer, are over the school's intercom system just as it was with Abington, supra, decided by the Supreme Court of the United States.

Furthermore, the policies of the School Board do not change the results. There is an inference, which the Court accepts, that, not only do the superintendent of schools and the principal permit or condone the practices, but the School Board is fully aware of the fact that their duly authorized officials, in charge of the schools, permit the practices each morning.

This is, beyond all question, a utilization of the tax-established and tax-supported public school system to aid religious practices. McCollum v. Board of Education, supra, page 210, 68 S.Ct. 461. And it falls squarely under the ban of the First Amendment (made applicable to the States by the Fourteenth) as was construed in the Case of Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711. The Court there stated:

"Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertain-

1. The defendants contend that the Board of Commissioners of the Baltimore City schools adopted its rule with reference to religious practices within the school pursuant to a specific Maryland Statute. However, the Statute of Maryland (Anno.Code of Maryland, Art. 77, §§ 142, 143, Chapter 12) by which the Board acted, provides general powers and duties of the Board as do the Statutes of Arkansas.

ing or professing religious beliefs or disbeliefs, for church attendance or nonattendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.' " Pages 15–16, 67 S.Ct. pages 511–512.

As to the religious character of the practice, there is no dispute. The defendants make no claim that the Bible is not an instrument of religion. The reading of verses from the Bible and recitation of the Lord's Prayer is a ceremony of religious character which cannot be gainsaid.

■ Obviously, the Student Council of the Cross County High School is an approved group and recognized as an integral part of the school's organization. Any action of the Student Council would, therefore, come within the purview of the School Board's responsibility as authorized by the General Assembly of Arkansas referred to herein. As already stated, under the Statutes of Arkansas, the School Board has broad discretion in the affairs of school activities. In recent years it has been the policy within the school districts of Arkansas to promote and establish a Student Council as a part of the school administrative responsibility. In Arkansas, as perhaps elsewhere, the superintendent, principal, and teachers, approve the membership of the Student Council and supervise the direction and activity of the Council. As already noted, in the instant case the principal of the High School, with the concurrence of the superintendent, granted permission for the religious exercise to be conducted each day over the school's intercom.

The defendants rely on the doctrine of "neutrality" as to the practice of Bible reading and prayer. They base their case on the contention that the establishment clause, as it interlocks with the free exercise clause, does not require the administration to deny the use of school facilities to the students who shall voluntarily and upon their own initiative, perform such religious exercises each day.

The plaintiffs base their case on the contention that neutrality on the part of the administration means that the Board must not only not require, but it must forbid any independent action by the students among themselves which relates to Bible reading and reciting the Lord's Prayer, connoting religious "overtones".

This Court is not persuaded that the responsibility of the School Board may be treated so lightly as the School Board insists, which amounts to a "Hands-Off" attitude. The statute makes specific requirements of the School Board and authorizes the Board to provide education of the children within the District through public school facilities. The School Board is required by law to establish, maintain, and operate the schools, which includes school buildings, and all other necessary facilities for such use. School attendance by school children is compulsory, i. e. they are required to attend under penalty.

The format of the school program is that the second bell rings at 8:25 A.M. Students are expected to be in their classroom; intercom of the school becomes operative and announcements are made. The religious exercises are performed by some member of the Student Council. Although employees of the School District do not participate in the selection or reading of Bible verses or recitation of the Lord's Prayer, it is done with the approval of school officials and obviously supervised by teachers in the respective classrooms.

McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 648, in an opinion delivered by Mr. Justice Black, relates to the power of a state to utilize

its tax-supported public school system in "aid of religious instruction" as that power may be restricted by the First and Fourteenth Amendments to the Federal Constitution.

In that case, a group with varied religious faiths formed a voluntary association called Council on Religious Education. They obtained permission from the Board of Education to offer classes in religious instruction to public school children in grades four to nine inclusive. Classes consisted of pupils whose parents signed cards requesting that their children be permitted to attend. The classes were held weekly, thirty minutes for the lower grades, and forty-five minutes for the higher grades. The Council employed the religious teachers at no expense to the school authorities. The instructors were subject to the approval and supervision of the superintendent of schools. The classes were taught by three separate religious groups, Protestant teachers, Catholic priests, and a Jewish rabbi. They were conducted in the regular classrooms of the school building. Students who did not choose to take the religious instruction were not released from public school duties; they were required to go to some other place in the school building for pursuit of their secular studies. Students released from secular study for the religious instructions were required to be present at the religious classes.

Tax-supported property for religious instruction was used and there was close cooperation between the school authorities and the Council promoting religious education. The operation of the State's compulsory education system assisted with the program. The Supreme Court held, at page 210, 68 S.Ct. at page 464, as follows:

"This is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith.

\* \* \* \* \*

Here not only are the state's tax-supported public school buildings used for the dissemination of religious doctrines. The State also affords sectarian groups an invaluable aid in that it helps to provide pupils for their religious classes through use of the state's compulsory public school machinery. This is not separation of Church and State." [2]

In this Case, as in McCollum, the practice of the religious exercises conducted on school property is "patently woven into the working scheme of the school". Thus, the arrangement presents substantial elements of inherent pressure by the school system in the interest of religion. That a child is not required to be in the classroom, although expected, is beside the point. It does not eliminate the operation of influence by the school

2. Mr. Justice Frankfurter delivered a concurring opinion in which Mr. Justice Jackson, Mr. Justice Rutledge and Mr. Justice Burton joined in his opinion, Mr. Justice Frankfurter stated:
"We are all agreed that the First and the Fourteenth Amendments have a secular reach far more penetrating in the conduct of Government than merely to forbid an 'established church.' But agreement, in the abstract, that the First Amendment was designed to erect a 'wall of separation between Church and State,' does not preclude a clash of views as to what the wall separates." Page 213, 68 S.Ct. page 466.
He then proceeds to give a brilliant description of the history of religious education in America, the place of the 'released time' movement in that history, and its precise manifestation in that case. He stated that Elihu

Root was able to summarize a century of the nation's history: "It is not a question of religion, or of creed, or of party; it is a question of declaring and maintaining the great American principle of eternal separation between Church and State."
Prohibition of the commingling of sectarian and secular instruction in the public school is only half of the story. "Abortive attempts were therefore frequently made to obtain public funds for religious schools." Further, he said: "Separation means separation, not something less." "The public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools, to avoid confusing, not to say fusing, what the Constitution sought to keep strictly apart".

in matters sacred to conscience and outside the school's domain. The law of imitation operates, and non-conformity is not an outstanding characteristic of children. McCollum, supra, page 227, 68 S.Ct. 461.

It has been consistently held that the result in such circumstances is an obvious pressure upon children to attend.

The contention of neutrality, relied upon by the defendants, that is, neither aiding or opposing religion, was dealt with at length in Abington School District v. Schempp, supra. The Court concluded 374 U.S. at page 225, 83 S.Ct. at page 1573, as follows:

"Finally, we cannot accept that the concept of neutrality, which does not permit a State to require a religious exercise even with the consent of the majority of those affected, collides with the majority's right to free exercise of religion. While the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to anyone, it has never meant that a majority could use the machinery of the State to practice its beliefs. Such a contention was effectively answered by Mr. Justice Jackson for the Court in West Virginia Board of Education v. Barnette, 319 U.S. 624, 638 [63 S.Ct. 1178, 1185, 87 L.Ed. 1628] (1943):

'The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to . . . freedom of worship . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.' "

Finally on this issue the Court thoroughly subscribes to the statement of the Supreme Court in Abington, supra, that religion has been closely identified with our history and government; that the history of man is inseparable from the history of religion. Further, that since the beginning of that history, many people have devoutly believed that "More things are wrought by prayer than this world dreams of".

It is stated at page 226, 83 S.Ct. at page 1574, as follows:

"The place of religion in our society is is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to recognize through bitter experience that it is not within the power of government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard".

It has been argued that to apply the Constitution in such a way as to prohibit the practices respecting the establishing of religious services in public schools is tantamount to hostility of the Government to religion or toward prayer. The Supreme Court has consistently struck down such contention. Nothing, of course, could be more wrong. A manifestation of such hostility would be at war with our national declaration as embodied in the First Amendment guaranty of the free exercise of religion. The First Amendment rests upon the premise that both religion and government can best work to achieve their lofty aim if each is left free from the other within its respective spheres. McCollum v. Board of Education, supra; Engel v. Vitale, 370 U.S. 421, 433-4, 82 S.Ct. 1261, 8 L.Ed.2d 601.

Applying the above stated rule to the facts, as stipulated by the parties in this case, the Court can only conclude that the exercise, as permitted by the Cross County School, of a member of the Student Council reading verses from the Bible and the recitation of the Lord's Prayer over the school's intercom, is in contravention of the First Amendment to the Constitution of the United States which declares that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise

thereof", as made applicable to the states by the Fourteenth Amendment.

The second issue included in the stipulation of the parties presents the question as to the validity of baccalaureate services for the senior class as a part of the graduation exercises at the Cross County High School. Services are held in the auditorium of the High School at a time other than a school day when classes are being conducted. The fact that attendance is voluntary, and the speaker is selected by nomination and election by members of the senior class, is of no import. The fact that the speaker is usually a minister of one of the local churches in the school district is of some significance, but not controlling.

■ Applying the conclusions, the Court has reached in this opinion, the question is whether the holding of a baccalaureate service in the auditorium of the Cross County High School for the graduating class, with the speaker a minister, is of such religious character as to bring it within the prohibition of the establishment clause of the First Amendment. The stipulation does not include a format of the services. There is no mention that the speaker, although a minister, reads from the Bible or that he, or anyone else, engages in prayer as a part of the services. It might be inferred from the mere fact that it is designated as a "baccalaureate service" with a minister as the speaker.

■ The plaintiffs have the burden of proof; they are content with reliance on the stipulation. Notwithstanding the inference, the Court cannot accept the fact that the service held is a baccalaureate, or that the speaker is a minister, brings the meeting within the rule that it is of a religious character, per se. The Court can only conclude that the stipulation on this question is insufficient to bring the practices within the actions prohibited by the First Amendment. The plaintiffs, on this question, therefore, have failed to discharge their burden of proof.[3]

The third issue presented by the stipulation involves the question of the validity of permitting representatives of the well-known and active Gideon organization to distribute their Bibles to students of the fifth grade class of the District's elementary schools. The fact that someone from the Gideon Society visits each of the elementary schools in the School District annually and presents the Gideon Bible to each student of the fifth grade class is of some significance. The Court has already determined that the Bible is an instrument of religion. The fact that it only contains the King James Version of the New Testament, Book of Psalms, and the Book of Proverbs, does not change the religious character of the Gideon's presentation to fifth grade students. The fact that a student is not required to accept the presentation is of no significance.

The defendants contend that the Bible is a proper book for study in the public schools and cites Abington, supra, for the rule that a person's education is not complete without a study of comparative religion or the history of religion and its relationship to the advancement of civilization. As to the importance of the literary and historic qualities of the Bible in the public school, there can be no dispute. However, the stipulation does not include any fact that the Gideon organization presents the New Testament and certain Books of the Old Testament for this purpose. The stipulation says the Gideon Society's representative explains to the students where the Gideon Society distributes partial Bibles

---

3. In recognition of the religious character of baccalaureate services for graduating classes, as commonly accepted, more and more of the schools in Arkansas are arranging for such services, in honor of the graduation class, to be held at one of the local churches, or some other facility, within the community, other than the schools, in order to avoid the question. The Court knows of no standard format and the parties have presented no information of such adopted by the Cross County School District, or any other school district within the State.

and the activities of the Gideon Society. This, obviously, identifies the purpose of the Gideon Society.

The Gideons are laymen from all the various evangelical denominations, Christian business and professional men with a vital testimony for the Lord. The primary object of the Gideons is to win others to the Lord Jesus Christ, and an effective means to this end has been the wide distribution of the Word of God. The Gideons seek to spread the Bible, the Word of God, and to encourage its use as widely as possible. The Lord has opened doors for the placement of His Word among many strategic groups of the population and in places through which large and important streams of national life pass from day to day. [From the Gideon Bible, just preceding the Forward Page G–29]

The Court is not aware of any decision of the Federal Courts wherein this specific issue was considered and determined; counsel for the parties have cited no case detemined by the Federal Courts. The plaintiffs cite a New Jersey case, Tudor v. Board of Education, 14 N.J. 31, 100 A.2d 857 (N.J.1953). In an opinion by Chief Justice Vanderbilt, the New Jersey Supreme Court held, at page 868:

"We cannot accept the argument that . . . the State is merely 'accommodating' religion. It matters little whether the teachers themselves will distribute the Bibles or whether that will be done by members of the Gideons International. The same vice exists, that of preference of one religion over another. . . . The society is engaged in missionary work, accomplished in part by placing the King James version of the Bible in the hands of public school children throughout the United States. To achieve this end it employs the public school system as the medium of distribution. . . . In other words, the public school machinery is used to bring about the distribution of these Bibles to the children . . . ." See

Miller v. Cooper, 56 N.M. 355, 244 P.2d 520 (N.Mex.1952); concurring opinion by Mr. Justice Brennan in Abington, supra, 374 U.S. 203, 263, 83 S.Ct. 1560, Footnote.

█ This Court concludes, as did the New Jersey Court in Tudor, supra, that "[t]he public school machinery is used to bring about the distribution of these Bibles to the children . . .. In the eyes of the pupils and their parents the board of education has placed its stamp of approval upon this distribution and, in fact, upon the Gideon Bible itself . . . This is more than mere 'accommodation' of religion permitted in the Zorach case. The school's part in this distribution is an active one and cannot be sustained on the basis of a mere assistance to religion." [Certiorari denied in Tudor, 348 U.S. 816, 75 S.Ct. 25, 99 L.Ed. 644 (1954)].

The practice, therefore, as approved by the School Board and permitted by the school authorities of distributing the Gideon Bible by a representative of the Society to the fifth grade students in the elementary schools of the Cross County School District is an exercise of religious character which is prohibited by the First Amendment to the Constitution as made applicable to the States by the Fourteenth Amendment.

Having reached the conclusions as to certain practices authorized, condoned and permitted, by the School Board and its officers, agents and employees, of the Cross County School District No. 7, it is unnecessary to consider and the Court makes no further comments with reference to the policies of the School Board, as included in Paragraph IV of the stipulation. The decision of the Court, as included in this opinion, will obviously require the School Board to modify its policies with reference to religious activities.

The School Board, superintendent of schools and other agents and employees, will take necessary action consistent with this opinion.

The Court incorporates, in this opinion, its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

Counsel for the plaintiffs will prepare an appropriate Judgment consistent with this opinion.