Marvin MELTZER, etc., et al., Plaintiffs-Appellants,

v.

BOARD OF PUBLIC INSTRUCTION OF ORANGE COUNTY, FLORIDA, etc., et al., Defendants-Appellees.

No. 75–1423.

United States Court of Appeals, Fifth Circuit.

March 11, 1977.

Rehearing En Banc Granted May 25, 1977.

Jerome J. Bornstein, Orlando, Fla., for plaintiffs-appellants.

William M. Rowland, Jr., John W. Bowen, Orlando, Fla., for defendants-appellees.

Before BROWN, Chief Judge, and TUTTLE and GEE, Circuit Judges.

JOHN R. BROWN, Chief Judge:

In this, their second visit [1] to the Court of Appeals in this case, the plaintiff-appellants, parents of children attending public schools in Orange County, Florida, appeal from the dismissal of their case by the District Court. We find that the District Court properly denied injunctive relief to plaintiffs, but improperly denied declaratory relief. Accordingly, we reverse.

### The Board Meetings

The facts of this case are undisputed. On August 24, 1970, Defendant, the Orange County Board of Public Instruction, held a meeting and adopted a resolution calling for a five minute to seven minute morning exercise in every school to consist of "a period of meditation which shall include the opportunity for individual prayer and Bible reading or devotional or meditation presented by groups or organizations or an individual," followed by a patriotic exercise. At the same meeting, a member of the Gideon Camp asked for permission to dis-

1. The first was *Meltzer v. Bd. of Pub. Instruction of Orange County, Florida*, 5 Cir., 1973, 480 F.2d 552.

tribute Gideon Bibles to the students at the public schools. The request was approved.

At the next meeting of the Board, on September 15, 1970, the eventual plaintiffs in this case complained to the Board that the August 24 resolution violated their religious rights. The Board deferred action on the complaints until it could conduct a survey to determine exactly how the August 24 resolution was being implemented and to obtain the opinion of its counsel regarding the legality of those policies and their implementation.

At the third Board meeting, the survey ordered in the September 15 meeting was released. This survey revealed that 70 of the 97 schools in Orange County were practicing daily Bible reading, generally read aloud to a class by a student or the classroom teacher. In some public schools, the Bible reading was given over the school public-address system. In some, the Lord's Prayer was recited. The survey showed that only four of the County's 97 schools had neither prayer nor Bible reading.

**2.** Chapter 231.09(2) of the Florida Statutes provides:

231.09 Duties of instructional personnel.— Members of the instructional staff of the public schools, subject to the rules and regulations of the state board and of the school board, shall perform the following functions:

(2) *Example for pupils.*—Labor faithfully and earnestly for the advancement of the pupils in their studies, deportment and morals, and embrace every opportunity to inculcate, by precept and example, the principles of truth, honesty and patriotism and the practice of every Christian virtue.

**3.** TO:
ALL ORANGE COUNTY PUBLIC SCHOOL PRINCIPALS
FROM:
JAMES M. HIGGINBOTHAM
District Superintendent

SUBJECT:

RELIGIOUS BOOKS AND LITERATURE

The following guidelines have been developed by the School Board Attorneys and apply to the handling of religious books, doctrine, or literature which may be offered to the schools for distribution. These guidelines are to be reviewed by *you* in detail and are to receive *immediate implementation.*

At this meeting, eventual plaintiffs repeated their complaints about the devotional and the distribution of Gideon Bibles. Counsel for the Board, however, gave his opinion that the morning exercises were not illegal, citing in part Chapter 231.09(2) of the Florida Statutes: [2]

"The policy aids school officials to carry out their specific duties set forth in 231.-09 among which are to 'inculcate, by precept and example . . . the practice of every Christian virtue . . . .' Those who feel that the policy is unconstitutional should bring their case to Court."

The Board thereupon refused to modify its policy regarding opening day exercises or to direct any change in its implementation.

On October 7, 1970, the Board issued guidelines concerning the distribution of Bibles or other religious literature.[3]

### The Trial Court—Round I

On October 16, the plaintiffs filed their complaint as a class action, alleging (i) that

The procedures as contained in the attached guidelines are the only procedures authorized by this office and shall be the sole method of handling material of this nature.

*GUIDELINES*

The following are guidelines for the principals of the Orange County District School Board schools for handling of religious books or doctrine offered to the schools for free distribution. We emphasize that we are directing these guidelines only toward religious books and doctrine not intending to modify general present policies or guidelines with regard to other literature.

1. A place be designated within the school facility for all religious books and literature which may be supplied by outside groups or organizations.

2. Books and literature be available to the students only at the designated location.

3. All faiths be allowed to provide books and literature under the terms of these guidelines.

4. No distribution nor allowing of distribution of books and literature be undertaken through the classroom, homerooms, in assembly or on any portion of school property by the staff, students or outsiders.

5. Periodic announcements may be made that literature is available at the designated place.

§ 231.09(2) is unconstitutional on its face because it commands the inculcation of *Christian* virtue; (ii) that the August 24 resolution and the morning exercises conducted pursuant to it are unconstitutional; (iii) that the distribution of Gideon Bibles is unconstitutional; and (iv) that a Southern Baptist program at the school planned for October 19 and 20 is unconstitutional, all being in violation of the First Amendment religion clauses, as made applicable to the states through the Fourteenth Amendment. The complaint sought both declaratory and injunctive relief and requested the convening of a three-judge court.[4]

On November 4, 1970, the District Court held a hearing to determine whether a temporary restraining order should issue. The plaintiffs presented the testimony of one parent who complained of the morning exercise; that of two rabbis who testified that reading the Bible to "religious minorities" is harmful to them, especially without interpretation, and that the Bible reading is blasphemous to Jews, even in a secular context because the Bible is inherently religious to Jews; and the testimony of a psychologist, who testified to the detrimental psychological effect on "religious minorities" of having readings from a book of a major religion. During this hearing, the constitutionality of § 231.09(2) was not put in issue.

On December 4, 1970, the District Court issued its order denying the temporary restraining order, on the grounds that the plaintiffs had failed to adduce sufficient evidence to show the possibility of irreparable injury, or to make findings of fact as to the morning exercises and the Bible distribution. However, the order did not stop there, but went on to discuss the legality of Bible reading in the schools. The Court concluded that the school cannot sponsor Bible reading as part of a devotional program, although the school is not required to be hostile to religion. Reference to the Bible as part of an "inspirational" rather than a "devotional" program is permitted under the First Amendment if (i) the reference to the Bible is a voluntary one by an individual student, and (ii) the reference is not school or teacher sponsored. The Court also noted that a Florida case, *Brown v. Orange County Board of Public Instruction*, Fla.App., 1960, 128 So.2d 181, could probably be read to prohibit distribution of Bibles in the schools.[5]

On January 14, 1971, the Defendants filed a statement of compliance[6] with the

---

6. No school employee may comment upon the decision by any group to make available or not make available literature, the content of such literature, or in any way influence others concerning the literature or concerning the taking or reading of the literature.

4. Although the complaint was careful to separate the practices complained of from the unconstitutional statute, it also stated that all of Defendant's actions complained of by plaintiff "were in reliance upon, in furtherance of and to implement Chapter 231.09(2) of the Florida Statutes."

5. The status of these asides by the District Court in the December 4 order was not made clear when delivered. Although not labeled as such, it seems to be a de facto declaratory judgment—a warning to the school board not to go too far in their Bible reading and distribution efforts. The final paragraph of the order gives something of its flavor:

"The denial of the temporary restraining order is not authority for the Board of Public Instruction to pursue any practices in violation of constitutional law as interpreted by the Supreme Court of the United States and the Florida courts. To the contrary, the Board should make any and all revisions to the wording of its resolution and to the practice thereunder as may be necessary to comply with the law as enunciated by the Supreme Court of the United States and the Florida Courts."

6. STATEMENT OF COMPLIANCE

Come now the defendants pursuant to the Order of this Honorable Court entered on December 4, 1970, and state as follows:
1. Defendants are complying with the Constitutional requirements as set forth in said Order.
2. Defendants will continue to implement the resolution requiring a period of meditation and as further required under the Constitution will not exhibit any hostility to religion

District Court's order of December 4, but on February 26, 1971, plaintiffs filed a statement alleging that the Board's policy had not been changed and was still in operation.

On March 8, 1971, the District Court held a hearing to determine whether or not Defendants had complied with its December 4 order. In the hearing, the plaintiffs asked the District Court to order the Board to modify its August 24, 1970 resolution concerning morning exercises, and expressed its confidence that a change in the resolution would be sufficient to correct minor illegalities in some of the morning exercises. Defendant agreed to change the wording of the resolution from "devotional" to "inspirational."

and will not promote a religion of secularism so as to show any preference for those who believe in no religion over those who do believe.

3. Acting in the spirit of community harmony, defendants will place all religious literature which may be made available to the Orange County school system only in the libraries of the schools.

7.　DEFENDANTS' STATEMENT OF COMPLIANCE

Pursuant to the oral Order of this Honorable Court, entered on March 8, 1971, the Defendants hereby submit the following Statement of Compliance:

1. Based upon the representations of counsel for Plaintiffs made during the hearing held on March 8, 1971, that Plaintiffs sole objection was the adjective "devotional" being in the Defendant Board's policy on opening exercises and that if the Defendants would replace the adjective "devotional" with the noun "inspiration" the Plaintiffs would not continue litigation nor would the Plaintiffs appeal any action of this Honorable Court, and based further upon the subsequent oral Order of this Honorable Court to Defendants to replace the adjective "devotional" with the noun "inspiration," and without admitting in any manner that Defendants have failed to comply with any Constitutional requirements, Defendants state to this Honorable Court that at a regular meeting held on Friday, March 12, 1971, Defendant Board officially amended the wording of its policy on opening exercises by changing the adjective "devotional" to the noun "inspiration."

8.　TRAVERSE TO DEFENDANTS' STATEMENT OF COMPLIANCE

Come now the Plaintiffs, by their undersigned attorneys, and file this traverse to

At the March 8 hearing, the plaintiffs requested a three-judge court to consider the constitutionality of the statute. The defendants argued that they were not the right defendants to sue concerning the statute but the plaintiffs responded that the resolution was passed pursuant to the statute. No action was taken at the hearing by the Court.

On March 16, 1971, defendant filed a second statement of compliance,[7] this time truthfully representing that it had changed the word "devotional" in the resolution to "inspirational." Plaintiff again filed a statement of noncompliance,[8] disclaiming any agreement not to appeal.

On December 8, 1971, the District Court issued a second order, in which it found that

Defendants' Statement of Compliance dated March 15, 1971, and submit the following:

1. Neither Plaintiffs, nor their counsel, have ever represented to the Court, or to Defendants, or to anyone else, that Plaintiffs' "sole objection was the adjective 'devotional' being in Defendant Board's policy on opening exercises . . .", nor have Plaintiffs, or their counsel, represented to this Court, to Defendants herein, or to anyone else that Plaintiffs would not continue this litigation nor appeal any action of this Honorable Court.

2. Plaintiffs filed the above-styled suit for several purposes:

(a) To object to the resolution of Defendant Board of Public Instruction which was an open invitation to the institution of Bible reading, prayer, and other sectarian practices in the public schools of Orange County, Florida;

(b) To object to the actions of Defendant's agents, servants, and employees, by the institution of Bible reading, prayer and other sectarian practices in the Orange County public schools as a result of the aforementioned Resolution, all of which has been proven by Plaintiffs by testimony presented to this Court and included in the depositions filed in the above-styled cause;

(c) To object to the distribution of Gideon Bibles and Youth Testaments in the public schools of Orange County, Florida; and

(d) To challenge the constitutionality of Chapter 231.09(2) of the Florida Statutes.

3. Plaintiffs' counsel has stated to this Court that the correction of the Resolution of the Defendant Board of Public Instruction, adopted August 24, 1970, would be acceptable to Plaintiffs in place of a court order striking down the objectionable portions of such Resolution of Defendant Board of Public Instruction of Orange County was amended

there had been no evidence of any violations in the morning exercises or in the distribution of Bibles since its December 4 order. Therefore, the Court stated, the attack on the statute must await the convening of a three-judge court, which it said it would request.

On May 24, 1972, the District Court issued a third order. The Court apparently changed its mind about convening a three-judge court, and decided to dispose of the issues itself. After discussing the principles of *Younger v. Harris*,[9] the Court decided that *Younger* did not apply in this case. However, the Court held that there was no likelihood that the statute would be enforced, and therefore there was no case or controversy remaining as to the constitutionality of the statute. The Court further stated that the voluntary cessation of misconduct by the Board after the suit was filed deprived the plaintiffs of any right to declaratory relief as to the morning exercises or Bible distribution issues.

The plaintiffs appealed to the Fifth Circuit from the May 24 order and judgment.

### The Court Of Appeals—Round I

On June 5, 1973, the Fifth Circuit decided that the record was deficient, and so remanded the case to the District Court to update the record, make findings of fact on the nature of the morning exercises and the extent of the school system's participation in the distribution of Gideon Bibles, and to clarify the exact nature of the District Court's December 4 order denying a tempo-

rary restraining order to which the Board had stipulated it was conforming. *Meltzer v. Board of Public Instruction of Orange County*, 5 Cir., 1973, 480 F.2d 552. On the three-judge court issue, the court held that there was no evidence that the statute had been or would be applied, and thus there had been no showing of irreparable injury necessary to obtain an injunction. Finally, the court remanded to the District Court for a determination of whether the likelihood that the statute would be enforced was so miniscule as to present no case or controversy, thus robbing the District Court of jurisdiction to grant even a declaratory judgment, or whether there was still a case or controversy present even though the danger of harm was not great and imminent enough to warrant an injunction.

### The Trial Court—Round II

On December 4, 1973, the District Court held a hearing following remand. At this hearing, the Board moved for dismissal on the grounds that there was no case or controversy presented by the facts. The Court postponed ruling on the motion until the close of the evidence, which consisted of the following. The first witness was one of the plaintiffs, who established continuing standing. The second witness was defendant's lawyer, who attempted to introduce into evidence his 1970 legal opinion basing the legality of the August 24 resolution on the "Christian virtue" statute. Although the opinion was marked as an exhibit for identification, objection to its admission into evidence was sustained.[10]

to conform to the constitutional requirements set forth by this Court in its Order dated December 4, 1970, and if further violation of the unconstitutional practices followed by the Defendant Board of Public Instruction since the opening of the current school year of 1970 would be enjoined by this Court, all as more specifically alleged in the Complaint filed herein and proven by the evidence before this Court, then and in that event there would be no necessity to appeal that portion of the Complaint which pertains to sectarian practices being followed in the public schools of Orange County, Florida. The determina-

tion of whether or not any appeal would be taken in this cause has always been dependent upon the scope of the order of this Court and no representations to the contrary have been made by Plaintiffs, or their counsel, to this Court, or to Defendants herein.

9. *Younger v. Harris*, 1971, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669.

10. Apparently, the Court refused to let the document into evidence on the ground that anything dated prior to 1973, the date of the Fifth Circuit opinion, was inadmissible for the purpose of determining whether or not a case or

The third witness was a school board member, who testified that, although the word "devotional" had been changed to "inspirational", no change in the actual conduct of the morning exercise was ordered. This witness also testified that at a recent Board meeting, the Gideon Camp had again requested the Board's permission to distribute Bibles in the schools. This request was tabled by a four to three vote. The sole reason for tabling the request was to wait for the new legal opinion of defendant's counsel, and defendant's counsel had informed the Board that it wished to wait for the conclusion of the current litigation before issuing an opinion.[11] The witness went on to testify that the motion would be re-opened for consideration as soon as this litigation reached its conclusion and the defendant's attorney gave them a legal opinion.

The next witness was the Deputy Superintendent of Schools. He testified that there had been no survey taken of morning exercises since the September 1970 survey, but that the Court's December 4 order had been distributed to all principals. He also testified that he had advised the principals that they were "to comply with the policy that was in existence at the present time concerning the opening exercises and that there should be a period of meditation in the school system that would provide the opportunity for individual prayer or Bible reading and inspiration and meditation." He further testified, however, that he did

not know whether or not there had been readings of the bible over the public address system as part of the morning opening exercise. He also testified that he did not tell the principals what could not be done under the Court's order, but only what could be done and still be in compliance with the policy. Finally, he testified that most of the schools used Christmas nativity scenes around the school at Christmas.

The next witness was a high school principal. He testified that it was the current and past practice of his school to have students read "inspirational" selections—usually from the Bible, both Old and New Testament—over the public address system each morning. The selections, he testified, are normally selected and read by students, often by the student council chaplain. He testified that he had the ultimate authority to approve or disapprove the selections chosen, but that he very rarely exercised his veto power. He further testified that, although he allowed an opportunity for silent prayer, by asking the students over the public address system to observe a period for silent meditation after the Bible reading, he did not allow oral prayer.

The next witness was a theologian. He testified that Christian virtue is not the equivalent of virtue in general. All Christian virtue, he testified, is dependent on faith, and Christian virtue cannot be taught properly without teaching the underlying faith. He listed faith, hope, charity, pru-

controversy existed at the time of this, the December 4, 1973, hearing. It is of course true that whether or not a case or controversy exists is to be determined as of the time of the court's hearing, rather than at the time of the commencement of the action. *Golden v. Zwickler,* 1969, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113. However, it is equally true that mere voluntary cessation of misconduct when a suit is filed does not necessarily render a case moot or remove the necessary justiciability. *See, e. g., DeFunis v. Odegaard,* 1974, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164; *United States v. W. T. Grant Co.,* 1953, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303. The crucial test, in an action involving a request for injunctive or declaratory relief, where defendant has voluntarily ceased his allegedly illegal conduct, is

whether it can be said with assurance that there is no reasonable expectation that the wrong will be repeated. *See* note 13, *infra.* Thus, it was error for the Court to refuse to allow this document into evidence on the ground that it related to events which occurred prior to 1973. The document might have had some bearing on the issue of whether or not there was danger of recurrence of the Board's violations, if any.

11. Thus, despite the "advice" or "guidelines" issued by the Court in its December 4, 1970 order, defendant's counsel—and the Board—apparently felt that the legality of further Bible reading and distribution was not settled, but instead depended on the outcome of the current litigation.

dence, temperance, fortitude and justice as the seven classic Christian virtues.

The final witness was a rabbi, who basically confirmed the previous theologian's testimony.

On January 22, 1975, the district Court entered its final order. The gist of this order was that no declaratory judgment or injunction would issue because there was no imminent threat· or likelihood of further violation of the morning exercise Bible readings and prayers and no imminent threat or likelihood of further violation of the order against Bible distribution. As to the Christian virtue statute, the Court held that there was no foreseeable irreparable injury, so that no injunction could issue. Furthermore, the Court found that there was no threat of enforcement of the statute sufficient to create the case or controversy necessary for a declaratory judgment to issue. The Court also decided that the statute is subject to varied interpretations, im-plying that abstention might be ·appropriate in this case. The court cited *Steffel* [12] for the proposition that there must be a genuine threat of enforcement before a declaratory judgment will issue. Finally, the Court failed to clarify or·even to discuss the legal effect of its December 4, 1970 order as instructed by the Fifth Circuit.

### *Injunctive Relief*

Defendants argue that that portion of the District Court's opinion denying injunctive relief is based on the case of *United States v. W. T. Grant Co.,* 1953, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303, in which the Supreme Court set forth the governing principles for determining whether a request for injunctive relief has been *mooted* by the voluntary cessation of allegedly illegal conduct by the defendant.[13]· Under that standard, defendant argues, we must uphold the District Court's denial of injunctive relief, since the evidence does not show

12. *Steffel v. Thompson,* 1974, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505.

13. "Both sides agree to the abstract proposition that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i. e,, does not make the case moot. *United States v. Trans-Missouri Freight Assn.,* 166 U.S. 290, 17 S.Ct. 540 [41 L.Ed. 1007] (1897); *Walling v. Helmerich & Payne, Inc.,* 323 U.S. 37, 65 S.Ct. 11 [89 L.Ed. 29] (1944); *Hecht Co. v. Bowles,* 321 U.S. 321, 64 S.Ct. 587 [88 L.Ed. 754] (1944). A controversy may remain to be settled in such circumstances, *United States v. Aluminum Co. of America,* 148 F.2d 416, 448 (1945, C.A.2d), e. g., a dispute over the legality of the challenged practices. *Walling v. Helmerich & Payne, Inc. (U.S.)* supra; *United Brotherhood C. & J. v. N. L. R. B.* 341 U.S. 707, 715, 71 S.Ct. 966 [95 L.Ed. 1309, 1316] 970 (1951). The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion. *United States v. Trans-Missouri Freight Assn.,* supra, [166 U.S.] at 309, 310, [17 S.Ct. [540], at 546, 547]. For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right, *N. L. R. B. v. General Motors Corp.,* 179 F.2d 221 (1950, C.A.2d). The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement. The case may nevertheless be moot if the defendant can demonstrate that "there is no reasonable expectation that the wrong will be repeated." The burden is a heavy one. Here the defendants told the court that the interlocks no longer existed and disclaimed any intention to revive them. Such a profession does not suffice to make a case moot although it is one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts.

Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. *Hecht Co. v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, [88 L.Ed. 754] supra; *Goshen Mfg. Co. v. Hubert A. Myers Mfg. Co.,* 242 U.S. 202, 37 S.Ct. 105 [61 L.Ed. 248] (1916). The purpose of an injunction is to prevent future violations, *Swift & Co. v. United States,* 276 U.S. 311, 326, 48 S.Ct. 311, 314, [72 L.Ed.· 587, 597] (1928) and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations."
*Id.,* 345 U.S. at 632–33, 73 S.Ct. at 897.

that the District Court abused the wide discretion afforded it under the *Grant* standard. We need not reach this contention of defendant's, however, for that part of the District Court's opinion which deals with injunctive relief shows clearly that the denial of injunctive relief was not predicated upon the ground of mootness, but upon the ground that "there is no imminent threat of future violation" so that the "stringent judicial remedy of injunctive relief is not required."

 We agree with the District Court that the imminency of harm from the recurrence of the practices complained of is not sufficient to warrant the issuance of injunctive relief. In reaching this conclusion, we are guided by the established principle of equity that "in considering whether to grant injunctive relief a court should impose upon a defendant no restriction greater than necessary to protect the plaintiff from the injury of which he complains.

**14.** "While a defendant may unilaterally act in such a manner as to cure the allegedly offensive conduct and foreclose the necessity for injunctive relief, that same unilateral action by the defendant may have no effect whatsoever on the necessity for declaratory judgment relief. Only when such unilateral action resolves or extinguishes all rights can the case or controversy be said to be no longer live and justiciable."
*Familias Unidas v. Briscoe,* 5 Cir., 1976, 544 F.2d 182 at 190.

**15.** In *Steffel v. Thompson, supra,* the Supreme Court discussed the different considerations involved in granting a declaratory judgment as opposed to granting an injunction, particularly where it is a *state* statute which is being challenged. First, a declaratory judgment will have a less intrusive effect on the administration of state laws:
 "As was observed in *Perez v. Ledesma,* 401 U.S. [82] at 124–126, [91 S.Ct. [674] at 696–697] 27 L.Ed.2d 701 (separate opinion of Brennan, J.):
 'Of course, a favorable declaratory judgment may nevertheless be valuable to the plaintiff though it cannot make even an unconstitutional statute disappear. A state statute may be declared unconstitutional in toto—that is, incapable of having constitutional applications; or it may be declared unconstitutionally vague or overbroad—that is, incapable of being constitutionally applied to the full extent of its

*See* McClintock on Equity § 146 (2d ed. 1948)." *United States v. Hunter,* 4 Cir., 1972, 459 F.2d 205, 219.

### Declaratory Relief

 This does not end the matter, however, for appellants have asked for both declaratory and injunctive relief. Under these circumstances, we have the "duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction."[14] *Zwickler v. Koota,* 1967, 389 U.S. 241, 254, 88 S.Ct. 391, 399, 19 L.Ed.2d 444. *See also Super Tire Engineering Co. v. McCorkle,* 1974, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1; *Steffel v. Thompson,* 1974, 415 U.S. 452, 468–69, 94 S.Ct. 1209, 39 L.Ed.2d 505; *Roe v. Wade,* 1973, 410 U.S. 113, 166, 93 S.Ct. 705, 35 L.Ed.2d 147. This is because "different considerations enter into a federal court's decision as to declaratory relief, on the one hand, and injunctive relief, on the other."[15]

purport. In either case, a federal declaration of unconstitutionality reflects the opinion of the federal court that the statute cannot be fully enforced. If a declaration of total unconstitutionality is affirmed by this Court, it follows that this Court stands ready to reverse any conviction under the statute. If a declaration of partial unconstitutionality is affirmed by this Court, the implication is that this Court will overturn particular applications of the statute, but that if the statute is narrowly construed by the state courts it will not be incapable of constitutional applications. Accordingly, the declaration does not necessarily bar prosecutions under the statute, as a broad injunction would. Thus, where the highest court of a State has had an opportunity to give a statute regulating expression a narrowing or clarifying construction but has failed to do so, and later a federal court declares the statute unconstitutionally vague or overbroad, it may well be open to a state prosecutor, after the federal court decision, to bring a prosecution under the statute if he reasonably believes that the defendant's conduct is not constitutionally protected and that the state courts may give the statute a construction so as to yield a constitutionally valid conviction. Even where a declaration of unconstitutionality is not reviewed by this Court, the declaration may still be able to cut down the deterrent effect of an unconstitutional

*Roe v. Wade, supra,* 410 U.S. at 166, 93 S.Ct. at 733.

The District Court found that declaratory relief could not be issued because there was no case or controversy.[16] We disagree.

■ The Declaratory Judgment Act's limitation to "cases of actual controversy" has regard to the constitutional provision in

state statute. The persuasive force of the court's opinion and judgment may lead state prosecutors, courts, and legislators to reconsider their respective responsibilities toward the statute. Enforcement policies or judicial construction may be changed, or the legislature may repeal the statute and start anew. Finally, the federal court judgment may have some res judicata effect, though this point is not free from difficulty and the governing rules remain to be developed with a view to the proper workings of a federal system. What is clear, however, is that even though a declaratory judgment has "the force and effect of a final judgment," 28 U.S.C. § 2201 [28 USCS § 2201], it is a much milder form of relief than an injunction. Though it may be persuasive, it is not ultimately coercive; noncompliance with it may be inappropriate, but is not contempt.' (Footnote omitted.)"
*Id.,* 415 U.S. 469–71, 94 S.Ct. 1221.
Second, engrafting
"upon the Declaratory Judgment Act a requirement that all of the traditional equitable prerequisites to the issuance of an injunction be satisfied before the issuance of a declaratory judgment is considered would defy Congress' intent to make declaratory relief available in cases where an injunction would be inappropriate.
. 'Were the law to be that a plaintiff could not obtain a declaratory judgment that a local ordinance was unconstitutional when no state prosecution is pending unless he could allege and prove circumstances justifying a federal injunction of an existing state prosecution, the Federal Declaratory Judgment Act would have been pro tanto repealed.' *Wulp v. Corcoran,* 454 F.2d 826, 832 (C.A.1, 1972) (Coffin, J.).
See *Perez v. Ledesma,* 401 U.S. at 116, [91 S.Ct., at 692–693] 27 L.Ed.2d 701 (separate opinion of Brennan, J.)."
*Id.,* 415 U.S. at 471, 94 S.Ct. at 1222.
Thus, as the Court in *Steffel* emphasized,
"The only occasions where this Court has disregarded these 'different considerations' and found that a preclusion of injunctive relief inevitably led to a denial of declaratory relief have been cases in which principles of federalism militated altogether against federal intervention in a class of adjudications.

Article III and is operative only in respect to controversies which are such in the constitutional sense, the word "actual" being one of emphasis rather than of definition. *See, e. g., Aetna Life Insurance Co. v. Haworth,* 1937, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, *reh. denied,* 300 U.S. 687, 57 S.Ct. 667, 81 L.Ed. 889. Thus, there can be no case or controversy where parties seek adjudication of only a political question,[17] or

See *Great Lakes Co. v. Huffman,* 319 U.S. 293, 63 S.Ct. 1070 [87 L.Ed. 1407] (1943) (federal policy against interfering with the enforcement of state tax laws); [20] *Samuels v.*

[20] In *Great Lakes Co. v. Huffman,* employers sought a declaration that a state unemployment compensation scheme imposing a tax upon them was unconstitutional as applied. Although not relying on the precise terms of 28 U.S.C. § 41(1) [28 U.S.C.S. § 41(1)], (1940 ed.), now 28 U.S.C. § 1341, [28 U.S.C.S. § 1341], which ousts the district courts of jurisdiction to 'enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State,' the Court, recognizing the unique effects of anticipatory adjudication on tax administration, held that declaratory relief should be withheld when the taxpayer was provided an opportunity to maintain a refund suit after payment of the disputed tax. 'In contrast, there is no statutory counterpart of 28 U.S.C. § 1341 [28 U.S.C.S. § 1341] applicable to intervention in state criminal prosecutions.' *Perez v. Ledesma,* 401 U.S. 82, 128, 91 S.Ct. 674, 699 [27 L.Ed.2d 701] (1971) (separate opinion of Brennan, J.)."

*Mackell,* 401 U.S. 66, 91 S.Ct. 764 [27 L.Ed.2d 688] (1971).

*Id.,* 415 U.S. at 472, 94 S.Ct. at 1222.

**16.** The District Court's opinion implies that appellants present an abstract or hypothetical question, because the practices complained of are not occurring at present and the statute complained of is not being currently enforced. The District Court bolsters its theory by concluding that there is no likelihood of future occurrence of these practices or of the enforcement of this statute.

**17.** *Schlesinger v. Reservist Committee to Stop the War,* 1974, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706; *Gilligan v. Morgan,* 1973, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407; *Powell v. McCormack,* 1969, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491; *Flast v. Cohen,* 1968, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947.

merely seek an advisory opinion,[18] or where the litigation presents merely an abstract, academic or hypothetical question,[19] or where the question sought to be adjudicated has been mooted by subsequent developments,[20] or where the plaintiff has no standing to maintain the action.[21]

In *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 1941, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826, the Supreme Court emphasized that the difference between an abstract question and a "controversy" contemplated by 28 U.S.C.A. § 2201 is necessarily one of degree. Faced with the difficulty of fashioning a precise test for determining whether there is such a controversy in a particular case, the Court substantially avoided the problem by using an essentially circular test: "The question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." [22] *Id.* at 273, 61 S.Ct. at 512.

In *Steffel v. Thompson, supra,* the Supreme Court discussed [23] and applied the case or controversy aspects of the Declaratory Judgment Act in its criminal setting. The Court there pointed out that there were two stages to the case or controversy inquiry. The first is whether the appellant's allegations are "imaginary or speculative" or whether they are, on the contrary, real and substantial.[24]

■ We have no difficulty in deciding, in the case before us, that the claims raised by appellants here are not imaginary, speculative, chimerical, or a mere ingenious academic exercise in the conceivable. Appellants have demonstrated that (i) extensive Bible distribution has taken place in the

18. *Richardson v. Ramirez,* 1974, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551; *Gilligan v. Morgan, supra; Laird v. Tatum,* 1972, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154, *reh. denied,* 409 U.S. 901, 93 S.Ct. 94, 34 L.Ed.2d 165; *Golden v. Zwickler,* 1969, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113; *Flast v. Cohen, supra; United Public Workers v. Mitchell,* 1947, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754; *Federal Radio Commission v. General Electric Company,* 1930, 281 U.S. 464, 50 S.Ct. 389, 74 L.Ed. 969.

19. *North Carolina v. Rice,* 1971, 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413 (abstract question); *United Public Workers v. Mitchell, supra* (abstract question); *In re Summers,* 1945, 325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795 (abstract declaration of law), *reh. denied* 326 U.S. 807, 66 S.Ct. 94, 90 L.Ed. 491; *Aetna Life Insurance Company v. Haworth, supra.*

20. *DeFunis v. Odegaard,* 1974, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164; *Gilligan v. Morgan, supra; Roe v. Wade, supra; North Carolina v. Rice, supra; Flast v. Cohen, supra; Liner v. Jafco, Inc.,* 1964, 375 U.S. 301, 84 S.Ct. 391, 11 L.Ed.2d 347; *Aetna Life Insurance Company v. Haworth, supra.*

21. *Schlesinger v. Reservist Committee to Stop the War, supra; Richardson v. Ramirez, supra; Gilligan v. Morgan, supra; Association of Data Processing Service Organizations, Inc. v. Camp,* 1970, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184; *Flast v. Cohen,* 1968, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947.

22. In *Preiser v. Newkirk,* 1975, 422 U.S. 395, 402, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272, 278, the Supreme Court, in applying this test, emphasized that the last clause of the test—"of sufficient immediacy and reality to warrant the issuance of a declaratory judgment"—was the crux of the test.

23. *See* the discussion in note 15, *supra,* where the Court in *Steffel* discussed the different considerations applying when declaratory relief is sought rather than injunctive relief.

24. In *United States v. Scrap,* 1973, 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254, the Court emphasized that "pleadings must be something more than an ingenious academic exercise in the conceivable. A plaintiff must allege that he *has been* or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action."

In *Preiser v. Newkirk, supra,* the Court emphasized that the crux of the *Maryland Casualty* test was the phrase, "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

In *Poe v. Ullman,* 1961, 367 U.S. 497, 508, 81 S.Ct. 1752, 6 L.Ed.2d 989, the question was phrased in terms of whether or not the appellant's claim raised issues which were "chimerical."

fairly recent past; (ii) there is a motion to resume such Bible distribution tabled, but breathing, on the school board's agenda, waiting only for a pronouncement by this Court (or a lack of any pronouncement); (iii) morning prayer of a near compulsory nature (since the prayer was made over a loudspeaker to a "captive audience") continued until the time this suit was filed and Bible reading over the public address system still takes place in some of the public schools in the area; (iv) the morning exercise devotional and the Bible distribution were initially adopted by the school board at least in part in express reliance on the "Christian virtue" statute; and (v) the statute is not discretionary but is mandatory, since it affirmatively directs the teachers and principals to inculcate every Christian virtue.[25] Clearly, then, the first step of the test as laid down in *Maryland Casualty* and *Steffel* is satisfied. These are parties who are legal adversaries engaged in a real and substantial controversy—a controversy which is not imaginary or speculative in any sense of the word.

The second stage of the inquiry, emphasized the Court in *Steffel,* is whether or not there is a *"continuing* existence of a live and acute controversy . . . ." *Id.,* 415 U.S. at 459, 94 S.Ct. at 1216. For, as a variety of Supreme Court cases have recognized,[26] an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed. The emphasis given to the phrase "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment," from *Maryland*

*Casualty* by the Supreme Court in *Preiser,* only underscores the two-step nature of the inquiry.

The Supreme Court's recent decision in *Super Tire Engineering Co. v. McCorkle, supra,* gives some guidance as to how immediate and real a controversy must be to justify declaratory relief.[27] In that case New Jersey workers engaged in an economic strike were eligible for public assistance through state welfare programs. Employers whose plants were struck sought an injunction against the New Jersey welfare administrators to have this practice stopped, and, in addition, sought a declaration that the New Jersey interpretative regulations according benefits to striking workers, were void.

Because the strike which instigated the lawsuit had ended, the Court had no difficulty in finding that injunctive relief should be denied, since the case was mooted for the purpose of granting injunctive relief. Recognizing the duty imposed by *Zwickler v. Koota, supra,* to examine requests for declaratory relief under different standards, however, the Court determined that the request for declaratory relief was embodied in a living case or controversy for the purposes of the Declaratory Judgment Act.

In reaching this conclusion, the Court applied the *Maryland Casualty* test and found that "the facts here provide full and complete satisfaction of the requirement of the Constitution's Art. III, § 2, and the Declaratory Judgment Act, that a case or contro-

---

25. It is of course true that the statute has not recently been enforced by disciplinary measures. But that does not remove the potential effect of its mandatory wording or remove the possibility of disciplinary measures for noncompliance in the future, particularly if we give our implicit sanction to the statute by failing to interpret it.

26. See, e. g., *Preiser v. Newkirk, supra; Roe v. Wade, supra; SEC v. Medical Comm. for Human Rights,* 1972, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560; *Golden v. Zwickler, supra; United States v. Munsingwear, Inc.,* 1950, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36.

27. In the *Grant* case (*see* note 13, *supra*), where the question was whether a request for injunctive relief had been mooted by the voluntary cessation of allegedly illegal conduct by a defendant, the Court emphasized that a heavy burden is upon the defendant to demonstrate that "there is no reasonable expectation that the wrong will be repeated." *See also DeFunis, supra,* (voluntary cessation of allegedly illegal conduct would not render a case moot only if it could be said *with assurance* that there is no reasonable expectation that the wrong will be repeated). Although the *Grant* test is not directly in point where declaratory relief is sought (*see* note 15, *supra*), it does furnish some guidance in this area.

versy exist between the parties. Unlike the situations that prevailed in *Oil Workers Unions v. Missouri,* 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960), on which the Court of Appeals' majority chiefly relied, and in *Harris v. Battle,* 348 U.S. 803, 75 S.Ct. 34, 99 L.Ed. 634 (1954), the challenged governmental activity in the present case is not contingent, has not evaporated or disappeared, *and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." Id.,* 416 U.S. at 122, 94 S.Ct. at 1698. [Emphasis supplied].

We conclude, from all the circumstances of this case, that the real and substantial controversy between these parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, as that latter phrase is tempered and given meaning by the "continuing and brooding presence" language of the Supreme Court in *Super Tire Engineering Company v. McCorkle, supra.* The school board only recently barely tabled a motion to permit renewed distribution of Bibles by the Gideon Camp. Apparently, the only reason the motion did not pass is that four of the Board members were cautious enough to wait to act until they received the advice of their lawyer. Their lawyer, in turn, was cautious enough to refuse any concrete advice until the termination of this litigation. It will not suffice, either, to argue that the strong dictum in the District Court's most recent opinion will prevent Bible distribution in the future by this School Board. The District Court issued the same strong dictum at the beginning of this litigation, in its very first order in this case, but that did not prevent the Board from considering, and nearly passing, a resolution which would have allowed renewed Bible distribution.

As to the Bible reading and prayer issue, there is no longer prayer in unison, but there is still Bible reading over the loudspeaker in at least some of the area schools,

to a "captive audience." The extent of this reading is unknown, because the Board has not conducted another survey since its initial survey—conducted immediately before the instigation of this litigation—indicated that nearly all of the area schools conducted morning devotionals with prayer in unison, Bible reading, and Bible distribution.[28] Finally, the testimony of the presiding officer of the school board and of one of the principals involved indicated that the only policy change made by the board was to change one word—"devotional" to "inspirational."

As to the issue of the "Christian virtue" statute, it should be emphasized, first, that the initial Board policy as to Bible distribution and reading and prayer was adopted pursuant to this statute. This policy is still in effect, with only one change—the word "devotional" has been changed to "inspirational." Furthermore, it should be emphasized that the statute is mandatory—it imposes an affirmative duty on the board and on area teachers and principals. Although no one has recently been disciplined for non-compliance with the statute, the possibility of enforcement always exists. However, the question in issue here is not whether or not this statute places an unconstitutional duty upon teachers, principals and school board members, but whether it infringes upon the First Amendment rights of school children. In this context, the lack of current enforcement via disciplinary proceedings against non-complying teachers is largely irrelevant. This statute (and Board policy), by its mandatory wording, must necessarily have the effect of encouraging those teachers who are already so predisposed, to inject their particular religious beliefs into the classroom. It may have the further effect of encouraging those who are neutral, or only weakly opposed to the statute, either to comply by bringing religion into the classroom or to acquiesce in other teachers' doing so. Since we are worried today about the effect of the statute on the school chil-

---

**28.** Furthermore, the presiding officer of the Board, in his testimony, demonstrated a remarkable lack of knowledge of the practices of the area schools in this regard, considering his function and responsibilities.

dren, rather than on the teachers, we refuse to accept the District Court's reasoning that, since the statute has not been recently enforced, there is no case or controversy sufficient to issue a declaration on its constitutionality.

Under these circumstances, we conclude that there is sufficient immediacy and reality to this controversy to warrant the issuance of a declaratory judgment, under the *Maryland Casualty/Steffel* test, as read in the light of the "continuous and brooding presence" language of *Super Tire Engineering Company v. McCorkle, supra.*[29]

### The Merits

#### Bible Reading And Prayer In Unison

In *School District of Abington Township v. Schempp,* 1963, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844, the Supreme Court held that a state statute[30] which required religious exercises in public schools consisting of the reading, without comment, at the opening of each school day, of verses from the Holy Bible and the recitation of the Lord's Prayer by the students in unison, was unconstitutional as a violation of the First Amendment's Establishment Clause, as applied to the states through the Fourteenth Amendment. The court rejected the defense of the defendant school board that the morning devotional had secular purposes, such as "the promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature. [Even] if its purpose is not strictly religious, it is sought to be accomplished through readings without comment, from the Bible. Surely the place of the Bible as an instru-

ment of religion cannot be gainsaid, and the State's recognition of the pervading religious character of the ceremony is evident from the rule's specific permission of the alternative use of the Catholic Douay version as well as the recent amendment permitting nonattendance at the exercises. None of these factors is consistent with the contention that the Bible is here used either as an instrument for non-religious moral inspiration or as a reference for the teaching of secular subjects." *Id.,* 374 U.S. at 223–24, 83 S.Ct. at 1572.

The Court also rejected the defense that individual students were allowed to absent themselves from the exercises upon parental request, "for that fact furnishes no defense to a claim of unconstitutionality under the Establishment Clause. See *Engel v. Vitale,* 1962, 370 U.S. [421], at 430, 82 S.Ct. [1261], at 1266–1267, 8 L.Ed.2d 601." Finally, the Court rejected the defense that "the religious practices here may be relatively minor encroachments on the First Amendment." "The breach of neutrality that is today a trickling stream may all too soon become a raging torrent . . . ." *Id.,* 374 U.S. at 225, 83 S.Ct. at 1573.

In this case, the school board passed a resolution calling for a five to seven minute morning exercise in every school to consist of "a period of meditation which shall include the opportunity for individual prayer and Bible reading or a devotional or meditation presented by groups or organizations or an individual" to be followed by a patriotic exercise. A survey conducted by the school board indicated that 70 of the 97 schools in Orange County were practicing daily Bible reading, generally read aloud to

29. *See also Familias Unidas v. Briscoe, supra,* at 189:

"The declaratory judgment action has enlarged the cases that may be entertained by the courts, provided there is sufficient personal stake and adversariness. *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Aetna Life Ins. Co. v. Haworth, supra.* It has been stated that courts consider to some extent the public interest in the decision to give or withhold relief. *Virginian Ry. Co. v. System Federa-*

*tion No. 40,* 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937). There is a tendency in declaratory judgment cases to construe the mootness doctrine more narrowly. *Porter v. Lee,* 328 U.S. 246, 66 S.Ct. 1096, 99 L.Ed. 1199 (1946); *Lehigh Coal & Nav. Co. v. Central R. of New Jersey,* 33 F.Supp. 362 (E.D. Pa.1940)."

30. Included within the Court's holding were rules of a school board adopted pursuant to statutory authority.

a class by a student or the classroom teacher. In some public schools, the Bible reading was given over the school public-address system. In some schools, the Lord's Prayer was recited. Only four of the County's 97 schools had neither prayer nor Bible reading. Clearly, these practices fall under both the rule and rationale of the *Abington* case as unconstitutional under the First Amendment, as applied to the states through the Fourteenth Amendment.

At the December 4, 1973, hearing on remand, the evidence before the District Court indicated that the school board changed only one word in its resolution since this suit was filed—the word "devotional" was changed to "inspirational."[31] Furthermore, a school board member testified that no change in the *actual conduct* of the morning exercise was ordered. The Deputy Superintendent of Schools testified that, at the time of the December 24, 1973, hearing, the schools were providing "a period of meditation in the school system that would provide the opportunity for individual prayer or Bible reading and inspiration and meditation." Finally, a high school principal testified that it was the current and past practice of his school to have students read "inspirational" selections from the Bible over the public address system each morning. The selections are normally selected and read by students, often by the student council chaplain.

We are convinced that these minor changes in the school board policy and practice do not cure the constitutional infirmities that we have found as to the initial board resolution and practices ordered pursuant to that resolution. Specifically, we find that it is the daily Bible reading to students in a "captive audience" situation over the public address system each morning, which is violative of the First and Fourteenth Amendments.[32]

*Bible Distribution*

The leading case to consider the issue of the constitutionality of Bible distribution to public school children is *Tudor v. Board of Education,* 1953, 14 N.J. 31, 100 A.2d 857, 45 A.L.R.2d 729, *cert. denied,* 348 U.S. 816, 75 S.Ct. 25, 99 L.Ed. 644. In that case, the New Jersey Supreme Court held that the distribution of Gideon Bibles to children in public schools was unconstitutional as showing a preference of one religion over another by the school authorities, where the Gideon Bible, following the King James version and confined principally to the New Testament, was not acceptable to Jews and Catholics, even though the Bibles were given only to children whose parents signed a request slip therefor, since this is more than mere accommodation of, or assistance to, a religious sect.[33] In reaching this result, the Court found, upon the testimony of psychologists, that pressures would be exerted upon non-conforming pupils, thus creating an unconstitutional preference, and reasoned that pupils and parents deemed the board's use of the school system as a means of distribution as placing its stamp of approval upon the Gideon version of the Bible. Thus, the Court rejected the argument that the proposed method of distribution in no way injected any issue of the "free exercise" of religion because no one was forced

---

**31.** With the change in wording, the amended resolution would read to require "a period of meditation which shall include the opportunity for individual prayer and Bible reading or *an inspirational* or meditation presented by groups or organizations or an individual . . . ." [Emphasis supplied].

**32.** The issue of oral prayer is now out of the picture, since the evidence indicates that no oral prayer is allowed or conducted in the schools. However, we emphasize that oral prayer of the type conducted when the school board resolution was first adopted would be violative of the First and Fourteenth Amendments under *Abington.*

**33.** "The full force of the violation of both the State and Federal Constitutions is revealed when we perceive what might happen if a single school board were besieged by three separate applications for the distribution of Bibles—one from Protestants as here, another from Catholics for the distribution of the Douay Bible, and a third from Jews for the same privilege for their Bible." *Id.,* 100 A.2d at 866, 45 A.L.R.2d at 739.

to take a New Testament and no religious exercise or instrument was brought to classrooms.

In *Brown v. Orange County Board of Public Instruction,* 1960, Fla.App., 128 So.2d 181, the Court held that a complaint stated a cause of action which alleged that the distribution of Gideon Bibles in public schools, as authorized by school officials, violated the First and Fourteenth Amendment rights of school children and their parents. In reaching this conclusion, the Court observed:

"The distribution of Gideon Bibles through the school system each year certainly approximates an annual promotion and endorsement of the religious sects or groups which follow its teachings and precepts. This distribution likewise would tend to impair the rights of plaintiffs and their children to be free from governmental action which discriminates in the free exercise of religious belief. . . ."

"If the Gideons, instead of distributing the King James Bible had distributed the Douay version exclusively, or the Koran, the Moslem Bible, or the Talmud, the body of Jewish civil and canonical law, through the school system of an area whose inhabitants were strongly Protestant, we surmise that the Protestant groups would feel a sectarian resentment against the actions of the school authorities."

"This question could be narrowed by suggesting that if the doctrinaire books of either the Methodist, Baptist, Presbyterian, or other of the numerous divisions of the Protestant world, were distributed through the school system to the exclusion of the other groups, considerable legal action would justifiably ensue." *Id.,* at 185.

Our research has disclosed only one federal case which has addressed the Bible distribution issue. In *Goodwin v. Cross County School District,* E.D.Ark., 1973, 394 F.Supp. 417, the District Court held among others, that the "practice . . . as approved by the School Board and permitted by the school authorities of distributing the Gideon Bible by a representative of the Society to the fifth grade students in the elementary schools of the Cross County School District is an exercise of religious character which is prohibited by the First Amendment to the Constitution as made applicable to the States by the Fourteenth Amendment." *Id.,* at 428. In reaching this conclusion, the Court placed primary emphasis [34] upon *Tudor* and its conclusion that the "public school machinery is used to bring about the distribution of these Bibles to the children. . . . In the eyes of the pupils and their parents the board of education has placed its stamp of approval upon this distribution and, in fact, upon the Gideon Bible itself . . . This is more than mere 'accommodation' of religion permitted in the *Zorach* case [*Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952)]. The school's part in this distribution is an active one and cannot be sustained on the basis of a mere assistance to religion." *Id.,* at 428, citing *Tudor, supra.*

In the case before us, the Gideons have already distributed thousands of Bibles to

34. The Court also emphasized the fact that it was stipulated by the parties that, in the presentation ceremony, the Gideon representative explained to the students the places where the Gideon Society distributed partial Bibles and the activities of the Gideon Society. This, the Court said obviously "identifies the purpose of the Gideon Society." *Id.,* at 427–28. The Court then went on to quote from the foreword of the Gideon Bible:

"The Gideons are laymen from all the various evangelical denominations, Christian business and professional men with a vital testimony for the Lord. The primary object of the Gideons is to win others to the Lord Jesus Christ, and an effective means to this end has been the wide distribution of the Word of God. The Gideons seek to spread the Bible, the Word of God, and to encourage its use as widely as possible. The Lord has opened doors for the placement of His Word among many strategic groups of the population and in places through which large and important streams of national life pass from day to day."

*Id.,* at 428, citing from the Gideon Bible, just preceding the Foreword Page G–29.

public school children in Orange County. They have used two methods of distribution. In the first wave of distribution, the Gideons simply walked into classrooms, asked the children who would like a free Bible, and passed out the Bibles to the children who raised their hands. In the second wave of distribution, the Gideons set up a central Bible distribution point on campus, and students who wanted Bibles had to walk to the distribution center to get them. In both methods, however, the distribution took place with the permission of the school board and the local schools. It also bears repeating that the school board has only recently tabled a motion by a four to three vote which would have allowed a new wave of Gideon Bible distribution.

 We are persuaded by the rationale of the above-cited cases that the distribution of Gideon Bibles to public school students violates the First Amendment. If anything, the method of distribution in the case before us is even more an encroachment upon First Amendment freedoms than was the distribution in *Tudor,* for the Board here did not make any provision for the distribution of any Bibles other than the *King James* version, nor did it make any provision for parents to have a say in whether or not the children would receive or not receive the Bibles.[35] In short, the school board's use of the school system as a means of distribution amounts to its placing, at least in the eyes of children and perhaps their parents, its stamp of approval upon the Gideon version of the Bible, thus creating an unconstitutional preference for one religion over another.[36]

### Christian Virtue

#### A Little Virtue Goes A Long Way

 The final issue we must consider is whether the "Christian virtue" statute of

Florida, § 231.09(2) (*see* note 2, *supra* ) is unconstitutional. We conclude that it is unconstitutional as presently worded.

Over a period of many years, the Supreme Court has developed a three part test for determining whether or not a challenged state statute violates the First Amendment. *See, e. g., Meek v. Pittenger,* 1975, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217, *reh. denied,* 422 U.S. 1049, 95 S.Ct. 2668, 45 L.Ed.2d 702; *Committee for Public Education & Religious Liberty v. Nyquist,* 1973, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948; *Lemon v. Kurtzman,* 1971, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745. The Court described the test recently as follows:

"First, the statute must have a secular legislative purpose. *E. g., Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228. Second, it must have a 'primary effect' that neither advances nor inhibits religion. *E. g., School District of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844. Third, the statute and its administration must avoid excessive government entanglement with religion. *E. g., Walz v. Tax Comm'n,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697."

"These tests constitute a convenient, accurate distillation of this Court's efforts over the past decades to evaluate a wide range of governmental action challenged as violative of the constitutional prohibition against laws 'respecting an establishment of religion,' and thus provide the proper framework of analysis for the issues presented in the case before us. It is well to emphasize, however, that the tests must not be viewed as setting the precise limits to the necessary constitutional inquiry, but serve only as guidelines with which to identify instances in which the objectives of the Establishment Clause have been impaired. *See Tilton v. Richardson,* 403 U.S. 672, 677–78, 91 S.Ct.

---

**35.** *See* note 3, *supra.*

**36.** We join with the Courts in both *Tudor* and *Brown* in surmising that if the tables were turned, so that it was the Douay version of the Bible, or the Koran, or the Talmud which was

being distributed to public school students, the Protestant groups in the County would feel a tremendous sectarian resentment against the actions of the school authorities.

2091, 2095, 29 L.Ed.2d 790 (plurality opinion of BURGER, C. J.)."

*Id.*, 421 U.S. at 358–59, 95 S.Ct. at 1760.

In *Lemon v. Kurtzman,* 1971, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745, the Court stated that in

"the absence of precisely stated constitutional prohibitions, we must draw lines with reference to the three main evils against which the Establishment Clause was intended to afford protection: 'sponsorship, financial support, and active involvement of the sovereign in religious activity.' *Walz v. Tax Commission,* 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970)."

*Id.*, 403 U.S. at 612, 91 S.Ct. at 2111.

In *Lemon,* the Court also emphasized that "in order to determine whether the government entanglement with religion is excessive, we must examine the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority. Mr. Justice Harlan, in a separate opinion in *Walz, supra,* echoed the classic warning as to 'programs, whose very nature is apt to entangle the state in details of administration. . . .' *Id.*, [397 U.S.] at 695 [90 S.Ct. [1409], at 1425]." *Id.*, 403 U.S. at 615, 91 S.Ct. at 2112.

### Secular Legislative Purpose

In *Epperson, supra,* the Court discussed the first part of the three part test. In that case, the State of Arkansas had passed a criminal statute making it a criminal offense for a teacher in any state school ·to teach the Darwinian theory of evolution. In examining this statute, the Court quoted *Abington, supra,* for the proposition that, if "either [the purpose or the primary effect of the enactment] is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution." *Epperson, supra,* 393 U.S. at 107, 89 S.Ct. at 272. The Court then went on to hold that these

"precedents inevitably determine the result in the present case. The State's un-

doubted right to prescribe the curriculum for its public schools does not carry with it the right to prohibit, on pain of criminal penalty, the teaching of a scientific theory or doctrine where that prohibition is based upon reasons that violate the First Amendment. It is much too late to argue that the State may impose upon the teachers in its schools any conditions that it chooses, however restrictive they may be of constitutional guarantees." [Citations omitted].

"In the present case, there can be no doubt that Arkansas has sought to prevent its teachers from discussing the theory of evolution because it is contrary to the belief of some that the Book of Genesis must be the exclusive source of doctrine as to the origin of man. No suggestion has been made that Arkansas' law may be justified by considerations of state policy other than the religious views of some of its citizens. It is clear that fundamentalist sectarian conviction was and is the law's reason for existence. Its antecedent, Tennessee's 'monkey law,' candidly stated its purpose: to make it unlawful 'to teach any theory that denies the story of the Divine Creation of man as taught in the Bible, and to teach instead that man has descended from a lower order of animals.' Perhaps the sensational publicity attendant upon the Scopes trial induced Arkansas to adopt less explicit language. It eliminated Tennessee's reference to 'the story of the Divine Creation of man' as taught in the Bible, but there is no doubt that the motivation for the law was the same: to suppress the teaching of a theory which, it was thought, 'denied' the divine creation of man."

"Arkansas' law cannot be defended as an act of religious neutrality. Arkansas did not seek to excise from the curricula of its schools and universities all discussion of the origin of man. The law's effort was confined to an attempt to blot out a particular theory because of its supposed conflict with the Biblical account, literally read. Plainly, the law is contrary to the mandate of the First, and in violation

. of the Fourteenth, Amendment to the Constitution."

*Id.*, 393 U.S. at 107–09, 89 S.Ct. at 272.

We conclude that the purpose of the "Christian virtue" part of § 231.09(2) is the advancement of a particular religion. Although our research has not disclosed any illuminating legislative history which would shed light on our task, we think it of particular significance that the Florida legislature passed a statute [37] only a few years prior to its passage of the Christian virtue statute, which made Bible reading mandatory in the public schools of Florida. This statute, which immediately preceded the Christian virtue statute in the Florida statutes, remained in effect until repealed in 1965. We think it not unreasonable to suppose that the Christian virtue statute, which was made an additional subsection to the same statute as the compulsory Bible reading statute, was meant to be complementary to that statute. A consideration of the conjunction of the two statutes, together with the extremely recent repeal of the compulsory Bible reading statute, lends persuasive weight to the theory that the Florida legislature had in mind a particular religion—the Christian religion—when it passed § 231.09(2).

**37.** This statute, passed in 1925, provided that

"Members of the instructional staff of the public schools, subject to the rules and regulations of the state board and of the county board, shall perform the following functions: *(2) Bible reading.*—Have, once every school day, readings in the presence of the pupils from the Holy Bible, without sectarian comment."

This statute was the original § 231.09(2). When the Christian virtue statute was passed in 1939, it became § 231.09(3). In 1965, when the compulsory Bible reading statute was repealed, the Christian virtue statute became § 231.09(2).

**38.** It is an elemental rule of statutory construction that if a "statute admits a reasonable construction which gives effect to all of its provisions," a court "will not adopt a strained reading which renders one part a mere redundancy. *See, e. g., United States v. Menasche*, 348 U.S. 528, 538–539 [75 S.Ct. 513, 519–520, 99 L.Ed. 615]." *Jarecki v. J. D. Searle & Co.*, 1960, 367 U.S. 303, 307–08, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859, 863.

More important, the very wording of the statute bespeaks a particular religious purpose. The Board and the State have argued very forcefully before us that the word "Christian" in the statute is a mere adjective with little or no import for the statute or its application. Under elemental rules of statutory construction, we must reject this argument.[38] The evidence below is very persuasive that the phrase, "Christian virtue" suggests a very particular type of virtue—a virtue that is tied particularly to one religion, and a type of virtue that is or may be at odds with other, minority, religions' concepts of virtue. Furthermore, common sense tells us that this is so. If this statute had required the inculcation of "Jewish virtue", or "Moslem virtue", we have no doubt that the unconstitutionality of the statute would be conceded by all. We can see no forthright, honest distinction when the word "Christian" is substituted for "Jewish" or for "Moslem" in our hypothetical. We therefore conclude that the "Christian virtue" statute has as one of its major purposes the advancement of a particular religion.[39]

### Primary Effect Of The Statute

In *School District of Abington Township v. Schempp, supra,* the Supreme

It is also a

"cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word. As early as in Bacon's Abridgment, sect. 2, it was said that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." This rule has been repeated innumerable times. Another rule equally recognized is that every part of a statute must be construed in connection with the whole, so as to make all the parts harmonize, if possible, and give meaning to each." *Washington Market Co. v. Hoffman*, 1879, 101 U.S. 112, 115–16, 25 L.Ed. 782, 783.

**39.** We are unconvinced by the State's argument that "Christian virtue" is a shorthand for virtue in a general philosophical sense. If the Florida legislature had meant to achieve such an effect, they could have chosen language must better suited to the task.

Court held that if the primary effect of a challenged state statute is to advance or inhibit religion, then that statute must be deemed an unconstitutional violation of the First Amendment. In the case before us, the record below reveals that the Board resolution allowing Bible reading, public prayers, and Bible distribution in the public schools was passed in furtherance of, and in reliance upon, § 231.09(2). Since we have already declared these practices unconstitutional, we can only conclude that the statute upon which the resolutions ordering these practices were grounded has a primary effect of advancing Protestant religion and inhibiting other religions.

Even if we had not already found that the statute had a religious purpose, we would still declare the statute unconstitutional because of its invalid primary effect.

We also emphasize that this statute is worded affirmatively.[40] It *requires* teachers to perform certain tasks—"Members . . . *shall perform* the following functions: . . . embrace every opportunity to inculcate, by precept and example, . . . the practice of every Christian virtue." [Emphasis supplied]. Given the mandatory wording and the specific instruction that it is to be "*Christian*" virtue which is inculcated, then the practical effect of the statute is much more likely to be the advancement or inhibition of religion than if the statute is not mandatorily worded.

### The Virtue Of The Latest If Not The Last Word

We emphasize that the downfall of this statute is its use of the word "Christian", and the effect the inclusion of that word

has had on the practices of the Board of Public Instruction of Orange County and the area public schools. If the statute read exactly the same, except that the word "Christian" was excised, we would probably hold the statute constitutional. As it stands now, we have measured it against the standards set by the Supreme Court for measuring whether a statute passes muster under the First Amendment, and we have found it wanting. Section 231.09(2), as currently written, is unconstitutional.

On remand the District Court with the essential help of counsel shall shape an appropriate decree consistent with this opinion hopefully to bring this case to an end.

REVERSED and REMANDED.

GEE, Circuit Judge (concurring in part and dissenting in part):

I agree that *Abington*[1] condemns the devotional period in question here. For reasons which I will shortly suggest in another context, Mr. Justice Stewart's dissent in that case seems to me to express the sounder view; but the majority opinion is the law, and we must acknowledge and obey it.

With greater reservations, I also agree that Fla.Stat. § 231.09(2) is unconstitutional insofar as it requires teachers to inculcate "Christian" virtue in their students. The majority warily concedes that the statute would "probably" be constitutional if it merely exhorted the teachers to inculcate virtue. For my part, I cannot conceive how it could fail to be. The Constitution can hardly be read as commanding mentors to be neutral as between virtue and vice in their pupils. It is true that the catalogue of

---

**40.** In *Abington, supra,* the Court stated that the "Free Exercise Clause, likewise considered many times here, withdraws from legislative power, state and federal, the exertion of any restraint on the free exercise of religion. Its purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority. Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion. The distinction between the two clauses is apparent—a violation of the Free Exercise Clause is predi-

cated on coercion while the Establishment Clause violation need not be so attended." *Id.,* 374 U.S. at 222–23, 83 S.Ct. at 1572.

We need not decide here, whether this statute, by its mandatory wording, violates the Free Exercise Clause as well as the Establishment Clause. We merely suggest that the presence of the mandatory wording in this statute renders the statute more constitutionally suspect, and in this case, unconstitutional, than would suggestive, non-mandatory wording.

**1.** *Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

Christian virtues is, as this record indicates, well established to consist of faith, hope, love, prudence, temperance, justice and fortitude. These qualities have, I venture, commonly been more esteemed in the young than their opposites: cynicism, despair, hatred, foolishness, excess, unfairness and cowardice. But to refer to them legislatively as "Christian" virtues is, though an accurate shorthand phrase, a somewhat loaded way in which to save four words and a doubtless-irritating indication to the fastidious that Florida generally endorses the Christian faith.

I dissent, however, from the court's invalidating what it terms "Bible Distribution," a characterization both too loose and too cryptic for what was being done here and one which conjures up visions of the favored Gideons, admitted where all others were excluded, buttonholing pupils in halls and classrooms and pressing Testaments upon them. Something bearing some resemblance to this may once have taken place in what the majority terms "the first wave of distribution," but it is now plainly forbidden by the Board's guidelines quoted by the majority at note 3. Yet the majority apparently sees no distinction between the two procedures, lumping them both together under the one category. But the practice currently permitted by the Board's guidelines and stricken down by the majority amounts to no more than permitting all faiths who wish to do so to deposit literature at a place designated by the school, where it may be picked up by any students who want it and ignored by those who do not.

This is the "only procedure" permitted by the defendant school board's rules for handling such matter.[2] Thus, the majority decrees that all religious literature must be entirely and completely banned from the Orange County schools and cannot even be left on a table to be picked up by passers-by.[3] In so doing, it adopts a view of the First Amendment which I, for one, find startling and distressing. This is that all

views and ideas may find orderly expression in the public-school forum—all, that is, *except* religious ones. These are to be banned upon some wooden, nonconstitutional formulation of a wall of separation between church and state. Thus, before our eyes, matters come full circle, the clock strikes thirteen, and the Monkey Trial is enacted in reverse.

There is neither need nor occasion for me to condemn at large such a crude and insensitive version of the separation of church and state. It has all been said before, and better than I could, by the Supreme Court:

There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated. And so far as interference with the "free exercise" of religion and an "establishment" of religion are concerned, the separation must be complete and unequivocal. The First Amendment within the scope of its coverage permits no exception; the prohibition is absolute. The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise the state and religion would be aliens to each other—hostile, suspicious, and even unfriendly. Churches could not be required to pay even property taxes. Municipalities would not be permitted to render police or fire protection to religious groups. Policemen who helped parishioners into their places of worship would violate the Constitution. Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; "so help me God" in our courtroom oaths—these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amend-

---

2. See text paragraph 2 in footnote 3 of the majority opinion.

3. One assumes that any detritus must now be burned by the janitor.

ment. A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: "God save the United States and this Honorable Court."

Zorach v. Clauson, 343 U.S. 306, 312–13, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952).

The majority, however, chooses to rest its position on Tudor v. Board of Education, 14 N.J. 31, 100 A.2d 857, 45 A.L.R.2d 729 (1953). Any opinion by Chief Justice Vanderbilt commands respect, and much of this one is indeed admirable. Commencing with a brief statement of operative fact, it sweeps on in its powerful course through an epitome of the historical developments leading up to the adoption of the First Amendment until, in the precise passage picked out and quoted by the majority at its note 33, it leaves the highway and comes to rest at the bottom of a vast non sequitur. The court had noted earlier that "[t]he charge here is sectarianism" and that "[t]he defendant board of education is accused of showing a preference by permitting [!] the distribution of the King James version of the New Testament . . . ."[4] It then discusses conflicts between the New Testament and the doctrines of Judaism, concluding with the passage selected by the majority for quotation at note 33:

"The full force of the violation of both the State and Federal Constitutions is revealed when we perceive what might happen if a single school board were besieged by three separate applications for the distribution of Bibles—one from Protestants as here, another from Catholics for the distribution of the Douay Bible, and a third from Jews for the same privilege for their Bible."

With respect, I do not see much force here or any violation unless the school board referred to proposes to select one or more sets of sacred writings for distribution and reject all others, an arrangement not suggested anywhere in Tudor or in our case. Were this the proposal, I could entirely agree with Tudor and with the majority. Since it is not, I do not see why our answer here should not be the same as under the First Amendment generally: let all be heard, the Jew, the Catholic, the Protestant, the Buddhist, the Atheist—all who care enough to come forward to advance or defend their views.[5] And this is precisely what the Board's guidelines, here voided, provide for.

With deference, it seems the majority's First Amendment proposal for handling religious questions amounts to silencing those who wish to speak in deference to those who do not wish or care to. This seems to me to single out religion for especial and hostile treatment and to stand the First Amendment on its head. I dissent from it.

---

4. 100 A.2d at 864, 45 A.L.R.2d at 736.

5. Subject, of course, to neutral considerations of time and space available, none of which are in issue here.