**VETERANS PEACE CONVOY, INC., et al., Plaintiffs,**

v.

**George P. SCHULTZ, Secretary of State, et al., Defendants.**

**Civ. A. No. L–88–47.**

United States District Court,
S.D. Texas,
Laredo Division.

Sept. 29, 1988.

quest, the court will direct the government to preserve them for appeal purposes.

Israel M. Reyna, Javier Riojas, William H. Beardall, Texas Rural Legal Aid, Inc., Laredo, Tex., Margaret Burkhart, Texas Rural Legal Aid, Inc., Edinburg, Tex., Susan Finkelstein, Texas Rural Legal Aid, Inc., San Antonio, Tex., for plaintiffs Diaz, Lopez and Centro Aztlan.

Margaret L. Ratner, Michael Ratner, David Cole, Jules Lobel, New York City, for Veterans Peace Convoy.

Steve Somerstein, Somerstein & Pike, New York City, for plaintiffs Livesey and Muskat.

Stephen A. Dixon, Baton Rouge, La., Ricardo De Anda, Laredo, Tex., for plaintiffs Pace and Nelson.

John R. Tyler, Atty., Dept. of Justice, Civ. Div., Washington, D.C., Sarah R. Tunnell, Asst. U.S. Atty., Houston, Tex., for defendants.

## MEMORANDUM OPINION

KAZEN, District Judge.

Plaintiffs originally sought declaratory and injunctive relief requiring Defendants, as agents of the United States Government, to release four vehicles allegedly seized unlawfully on June 15, 1988 and to permit export of these and other convoy vehicles to Nicaragua for humanitarian purposes. The four vehicles have since been released. Plaintiffs have now filed a motion for summary judgment. In a brief filed September 7, 1988, Plaintiffs abandoned the prayer for injunctive relief but they continue to seek a declaratory judgment construing one section of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, *et seq.*

*Background*

James M. Simons, Atty. in Charge, Austin, Tex., for plaintiffs.

The relevant facts are largely undisputed. The Veterans Peace Convoy, Inc. is an

organization created for the purpose of providing humanitarian aid to the people of Nicaragua. It is comprised of a network of individuals and organizations throughout the country who have solicited, contributed, and organized donations of humanitarian supplies to be transported in vehicles to Nicaragua. Some individual members of the organization are also Plaintiffs. There is no dispute that the contents of Plaintiffs' convoy vehicles constitute humanitarian aid under IEEPA. The issue is whether the vehicles can also be classified as humanitarian aid. The vehicles are mostly older model pickup trucks, vans, and buses. Plaintiffs filed a detailed list describing the various vehicles which formed the original convoy and the vehicles intended destinations and purposes. The destinations generally included various schools, hospitals and churches.

The convoy originally arrived in Laredo, Texas on June 7, 1988. U.S. Customs officials advised the convoy members that they would be sanctioned for any violation of IEEPA. Customs further advised that vehicles were not included within the statutory exemption for humanitarian aid in § 1702(b)(2), and that a license would be required from the Office of Foreign Assets Control, Department of Treasury ("FAC"). On June 15, the convoy attempted to cross the border without a license. Four vehicles were seized by Customs: a 1985 Nissan pickup, a 1979 Chevrolet pickup, a 1980 Toyota pickup, and a 1982 Chevrolet van. These vehicles have subsequently been released. On July 9 and again on July 11, a smaller convoy attempted to cross the border, but was again rebuffed by Customs. On each of the latter two occasions, local police arrested some convoy members on misdemeanor charges of obstructing a public roadway, because of traffic congestion at the international bridge when the convoy was not allowed to cross.

Eventually, between July 11 and August 20, 1988, for reasons that are not entirely clear, most of the original convoy vehicles successfully crossed the border into Mexico without being stopped by Customs. Defendants suggest that the convoy somehow accomplished the entries surreptitiously. Plaintiffs deny this. They assert that the convoy members presented themselves at the border "openly and straightforwardly,"

and were simply not stopped. Of the 38 vehicles in the original convoy, 29 are now in Nicaragua, 2 are in Guatemala, and 1 in Mexico. Six are in the United States.

Plaintiffs have announced a present intention to organize, promote and dispatch further groups of vehicles to travel to Nicaragua carrying cargos of humanitarian aid. The next such convoy is scheduled to depart in January, 1989.

### Is There a Live Controversy?

Because most of the original convoy vehicles eventually crossed the border, the Court directed the parties to brief the issue of whether there remains a justiciable issue in this case. Article III of the Constitution limits federal "judicial Power" to "Cases" and "Controversies." U.S. Const. art. III, Section 2, Cl. 1. This clause limits the federal courts to deciding "questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968). The controversy must exist at the outset of the litigation and continue throughout the existence of the suit. *Meltzer v. Bd. of Public Instruction*, 548 F.2d 559, 571 (5th Cir.1977); see e.g., *S.E.C. v. Medical Comm. for Human Rights*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972). A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982). As with other kinds of litigation, parties to a declaratory judgment action must have a sufficient personal stake and degree of adversariness to present a focused dispute for the Court to resolve. *Familias Unidas v. Briscoe*, 544 F.2d 182, 189 (5th Cir.1976); see *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). The Court is satisfied that this case presents a substantial controversy between parties with adverse interests within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201. See *Lake Carriers Ass'n. v. MacMullan*, 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972).

This case presents a focused dispute over whether Plaintiffs' export of vehicles to

Nicaragua requires a license under IEEPA. Plaintiffs have consistently contended that their exporting of vehicles constitutes humanitarian aid, and thus does not require a license, so long as they intend that the vehicles be used to relieve human suffering and the vehicles can reasonably be expected to serve that purpose. The Government has consistently responded that export of any vehicle without a license is illegal. Affidavit of Gerald Condon, pp. 1–5, September 7, 1988; Affidavit of James M. Simons, p. 1, September 2, 1988 (concerning a telephone call with John Tyler of the U.S. Department of Justice); Defendant's Supplemental Memorandum Addressing the Justiciability Issue, p. 2, August 31, 1988; Defendant's Memorandum in Opposition to Plaintiffs' Motion for Preliminary Relief, at 6–7, July 7, 1988.

Consistent with its interpretation of the statute, the Government seized four convoy vehicles on June 15, 1988. Even though the Government later released the vehicles, the parties' continuing disagreement over the proper interpretation of § 1702(b)(2) is more than an academic dispute. A reasonable expectation exists that the Plaintiffs' vehicles will be subjected to seizure in the future. Moreover, the Plaintiffs face a continuing threat of criminal and civil prosecution. As recently as September 2, 1988, John Tyler of the Department of Justice indicated that "the Government would stop all vehicles known to be going to Nicaragua for the purpose of leaving or donating the vehicle in Nicaragua, exactly as it has done before. No such vehicles would be knowingly allowed to cross the United States border." Affidavit of James M. Simons, September 2, 1988 (concerning a telephone call with John Tyler of the United States Department of Justice). Mr. Tyler also stated that the Government continues to reserve decision as to whether to prosecute the Plaintiffs. *Id.* On August 12, a convoy member was detained by U.S. Customs in Los Angeles upon his return from Nicaragua. Statement of David F. Tuttle, September 6, 1988. Allegedly Customs informed Mr. Tuttle that although he was not presently being charged with a violation of § 1702(b)(2), he "could expect to be picked up in the future." *Id.*

In an article of July 14, 1988, reporting that some convoy vehicles had crossed the border, *The Laredo Morning Times* quoted Charles Conroy of Customs' regional office in Houston that "if the vehicles are left in Nicaragua the drivers could face severe penalties upon their return to the U.S." On July 15, 1988, the *Dallas Morning News* printed an Associated Press story quoting Donna de la Torre, a "Customs spokeswoman," that the group which took vehicles to Nicaragua "still faces possible prosecution if it does not return the vehicles within 30 days."

The Plaintiffs claim that the threat of prosecution and seizure has made difficult their efforts to secure funding and support, and will deter others from openly associating with their organization. Affidavit of Gerald Condon, September 8, 1988; *see also* Affidavit of Michael Kreisburg, September 6, 1988.

■ The release of the Plaintiffs' vehicles does not render this case moot. It places this case within the class of controversies "capable of repetition, yet evading review." *First National Bank v. Bellotti,* 435 U.S. 765, 774, 98 S.Ct. 1407, 1414, 55 L.Ed.2d 707 (1978); *Southern Pac. Terminal Co. v. The Interstate Commerce Commission,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *Valley Construction Co. v. Marsh,* 714 F.2d 26, 28 (5th Cir.1983). The Court will not find mootness if the 1) challenged action was too short in duration to be fully litigated prior to its cessation and 2) a reasonable expectation exists that the same complaining party would be subjected to the same action again. *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975); *Connell v. Shoemaker,* 555 F.2d 483, 486 n. 3 (5th Cir.1977). The facts in the present case are analogous to those in *Floyd v. Bowen.* In that case plaintiffs sought a declaration that they were entitled to receive social security payments. Prior to a decision on the merits, the Social Security Administration granted plaintiffs the benefits. The Fifth Circuit held that the case was not moot for purposes of declaratory relief because a reasonable expectation of repetition of the contested actions existed, based on the possibility that the plaintiffs might encounter the challenged government action again. 833 F.2d 529, 531 n. 2 (5th Cir.1987); *see also Valley*

*Construction Co. v. Marsh,* 714 F.2d 26, 28 (5th Cir.1983). In the present case, the Plaintiffs have declared their intention to send additional vehicles to Nicaragua under the same circumstances which led to the Government's blocking their departure in June and July. The Government remains firmly committed both to its interpretation of the statute and to its policy of enforcing it by stopping vehicles whenever it can.

■■■ The fact that threatened prosecution is not actually pending does not preclude declaratory relief. *Steffel v. Thompson,* 415 U.S. 452, 475, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505 (1974). A plaintiff need not undergo an actual prosecution to have standing to challenge a statute. *City of Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 2508 n. 7, 96 L.Ed.2d 398 (1987); *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973); *International Soc'y for Krishna Consciousness v. Eaves,* 601 F.2d 809, 817 (5th Cir.1979). Plaintiff need only demonstrate a credible threat of prosecution under the challenged statute. *Babbitt v. United Farm Workers,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979). The Government has repeatedly affirmed its position that it reserves the right to prosecute under the statute and insists that Plaintiffs' conduct is illegal. The Government has not taken action which would remedy or resolve the issue. *See, Familias Unidas v. Briscoe,* 544 F.2d 182, 190 (5th Cir.1976); *see also, Meltzer v. Board of Public Instruction,* 548 F.2d 559, 572 (1977).

■■■ The Government alleges that the Plaintiffs surreptitiously crossed the border and thereby rendered their claims "too attenuated to be decided by the court." The cases cited by the Government hold that judicial remedy is inappropriate when "it appears that a challenged 'continuing practice' [of an administrative agency] is at the moment adjudication is sought, undergoing significant modification so that its ultimate form cannot be confidently predicted." *Chamber of Commerce v. United States Dept. of Energy,* 627 F.2d 289, 292 (D.C.Cir.1980) (citations omitted). In this case, the Government has not changed its policy nor offered any interim relief. Even if the Government had voluntarily ceased restraining members of the convoy from crossing the border, this Court would not be deprived of the power to hear and determine the case. *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). The voluntary cessation of the defendant's conduct would not be sufficient to render the case moot if there were a reasonable expectation that the defendant's conduct would recur. *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). There is such a reasonable expectation here, since Defendants insist that Customs will continue to stop any vehicle at the border if its agents become aware that the vehicle is destined for Nicaragua.

The Court concludes that this issue is not moot, and that it is necessary to resolve the dispute as to the meaning of § 1702(b)(2).

*What is the Scope of IEEPA's Humanitarian Aid Exemption?*

IEEPA grants authority to the President to investigate, regulate or prohibit a vast array of commercial transactions with foreign countries if the President declares a national emergency with respect to an "unusual and extraordinary threat" to the United States from an outside source. 50 U.S.C. § 1701. The President has formally declared that the policies and actions of the Government of Nicaragua constitute such an unusual and extraordinary threat and has declared a national emergency pursuant to IEEPA. Exec. Order No. 12513 (May 1, 1985). Notwithstanding the emergency declaration, IEEPA exempts humanitarian aid donations from Executive regulation unless the President makes further findings that the humanitarian aid would seriously impair his ability to deal with the emergency or would endanger our armed forces. 50 U.S.C. § 1702(b)(2). The President has not made these findings.

The issue here involves the definition of what articles are included within the humanitarian aid exemption. The pertinent language of § 1702(b)(2) is:

"(b) The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly—

.    .    .    .    .

(2) donations, by persons subject to the jurisdiction of the United States, of

articles, such as food, clothing, and medicine, intended to be used to relieve human suffering ..."

The parties contest the scope of the term "articles" in this provision. Both sides concede that the term is broader than food, clothing, and medicine, but they disagree on how much broader. Plaintiffs focus on the words "articles ... intended to be used to relieve human suffering," arguing that the "such as" language is merely illustrative. Based on IEEPA's legislative history, Plaintiffs urge an interpretation that would exempt donations of any articles intended to relieve human suffering which could reasonably be expected to serve that purpose. Defendants counter that the "such as" phrase restricts the definition of "articles" to items "of the same inherent nature" as food, clothing, and medicine, and which "could not be used for any purpose other than the relief of human suffering."

The starting point for interpreting any statute "must be the language of the statute itself." *Lewis v. United States*, 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980). If the statutory language is unambiguous, that language must ordinarily be regarded as conclusive. *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). Unambiguous statutory language cannot be materially altered by testimony of Congressmen and witnesses during the legislative process. *Regan v. Wald*, 468 U.S. 222, 237, 104 S.Ct. 3026, 3035, 82 L.Ed.2d 171 (1984).

Defendants insist that the pertinent language of § 1702(b)(2) clearly prescribes a "purely objective test" and limits the humanitarian aid exemption to "items of the same inherent nature" as food, clothing, and medicine. *Defendant's Supplemental Memorandum, etc.*, filed July 22, 1988 at p. 3. The Court does not agree that the statutory language is unambiguous. The Defendants have not been able to articulate what other items meet their "objective test." In briefs and arguments, they have asserted that the exemption would apply to such things as toys, blankets, and tents. A letter of November 19, 1985 to Rep. Don Bonker, Chairman of the House Subcommittee on International Economic Policy and Trade, from the Assistant Secretary of Treasury for Legislative Affairs, Bruce E.

Thompson, Jr., stated that the exemption "might encompass for example, blankets, tents, stretchers, rescue equipment, or other items in the event of natural disaster." This definition defies any notion of a narrow, limited "objective" exemption. What constitutes "rescue equipment"? Why would such equipment be inherently like food, clothing, and medicine? How would it qualitatively differ from a pickup truck, bus or van? What "other items" would come within the exemption in the event of a natural disaster? What constitutes a "natural disaster," and who makes that determination?

Defendants' implicit response to these questions is essentially "ask us and we'll tell you." This is the gist of 31 C.F.R. § 540.540, which states:

"Applications for specific licenses to export goods to Nicaragua for humanitarian, educational, or religious purposes will be considered on a case-by-case basis."

Defendants describe this provision as "an administrative remedy," whereby anyone seeking to donate articles to Nicaragua "can request an interpretation or apply for a license from FAC." *Defendants' Memorandum in Opposition to Plaintiffs' for Preliminary Relief, etc.*, filed July 12, 1988, p. 18. The difficulty with this approach is that it contravenes the statutory scheme. IEEPA does not create a scheme whereby all persons seeking to donate articles to a blocked country must obtain advance approval from FAC on a case-by-case basis. On the contrary, IEEPA provides that the Executive may not regulate qualifying humanitarian aid donations "directly or indirectly." This restriction would be effectively nullified by a scheme which would require all potential donors to seek a license from FAC in order to ascertain which articles come within the statutory exemption.

Defendants further argue that if the statute is subject to varying interpretations, considerable weight must be given to the Executive's interpretation because it has been entrusted with administering the statute. *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Defendants contend that FAC's interpretation of the disputed provision "has been uniformly applied in all IEEPA embargoes involving

export prohibitions," including Nicaragua (31 C.F.R. § 540.205) and Libya (31 C.F.R. § 550.202). *Defendants' Memorandum, Etc., supra,* p. 14. However, neither of those two regulations furnish any interpretation of § 1702(b)(2). They simply parrot the language of the statute. For example, § 540.205 provides:

"Except as authorized, no goods may be exported from the United States either to or destined for Nicaragua, except those for the organized democratic resistance, and except donated articles such as food, clothing, and medicine, intended to be used to relieve human suffering."

Deference to this "interpretation" would be futile. A July 6, 1980 declaration by FAC Director R. Richard Newcomb, filed in this case, asserts that the humanitarian aid exemption is limited to items "that could not be used for any purpose other than the relief of human suffering." Newcomb Declaration, paragraph 2. This interpretation is tantamount to a definition of articles "intended to be used *solely* to relieve human suffering," a phrasing initially contained in § 1702(b)(2) but ultimately deleted by both the House and Senate. The Thompson letter of November 19, 1985, declaring that the humanitarian aid exemption possibly includes such things as rescue equipment and "other items in the event of natural disaster," is a much broader interpretation which seems inconsistent with the strict interpretation being tendered in this case.

■ The Court cannot defer to the agency's interpretation when there is no consistent, published interpretation of § 1702(b)(2). Moreover, no interpretation by FAC can frustrate the clearly expressed intent of the Congress. *Chevron, U.S.A.,* 467 U.S. at 842–843, 104 S.Ct. at 2781–2782. The Court must reject an agency's statutory interpretations "that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Federal Election Comm'n. v. Senate Democratic Campaign Comm.,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981).

■ The legislative history supports Plaintiffs' interpretation of § 1702(b)(2). The original humanitarian aid exemption contained in H.R. 7738 was quite broad. It exempted from Executive regulation "uncompensated transfers of anything of value." *Amending the Trading with the Enemy Act: Hearings before the Subcomm. on International Finance of the Senate Banking, Housing and Urban Affairs Comm.,* 95th Cong., 1st Sess. 12 (1977) ("Senate Hearing"). The accompanying report of the House Committee on International Relations indicated that the President could regulate such transfers "in certain exceptional circumstances." H.R.Rep. No. 95–459, 95th Cong., 1st Sess. 15 (1977). It was the Committee's intent, however, that the exceptions be "narrowly construed, and that any doubt be resolved in favor of permitting such transfer to occur." *Id.* The Senate amended H.R. 7738 and narrowed the humanitarian aid exemption to "donations, by persons subject to the jurisdiction of the United States, of articles, *including* food, clothing, and medicine, intended to be used *solely* to relieve human suffering" (emphasis added). Senate Hearing at 14.

The then Assistant Secretary of Treasury, Fred C. Bergsten, applauded "three desirable changes" which the Senate amendment made to the House version. Senate Hearing at 4. First, the humanitarian exemption would be limited to persons subject to the jurisdiction of the United States. Next, the amended provision authorized donations of articles, but not monetary funds, thereby "increasing the likelihood that the donation would be used for the intended purpose." Finally, the amendment authorized the President to withdraw the exemption where it would impair his ability to deal with the national emergency. Mr. Bergsten concluded that the Senate amendment "strikes a reasonable balance between the effectiveness of any future embargo controls that may be in the national interest and the private convictions of American citizens attempting to alleviate personal difficulties in those countries." *Id.*

The Senate report accompanying H.R. 7738 further elaborated on the intended effect of the Senate amendment to § 1702(b)(2) and concluded:

"The committee intends that donations of articles by U.S. persons be *presumed* to be intended to be used solely to relieve

human suffering *when that is the stated intention of the donor and when the articles might reasonably be expected to serve that end."* (Emphasis added)

S.Rep. No. 95–466, 95th Cong., 1st Sess. at 5 *reprinted in* 1977 U.S.Code Cong. & Admin.News, 4540, 4544.

During the House reconsideration of the Senate's amended version of H.R. 7738, Rep. Jonathan B. Bingham, the principal sponsor of the bill and Chairman of the responsible House subcommittee, proposed further and final amendments to the humanitarian aid provision. He first proposed eliminating the word "solely" from the Senate version. He opined that if the word were not deleted, the humanitarian exemption would be virtually impossible to obtain. Rep. Bingham added:

> "Most donations would have some economic value and impact, in addition to relieving human suffering, and such economic value or impact should not preclude a donation from coming within the Senate's proposed 'humanitarian exemption.' "

123 Cong.Rec. 38165 (1977). Rep. Bingham next commented that the Senate version appeared to exempt only food, clothing, and medicine. He stated that this would be contrary to the intent "of both the House and Senate bills that any article other than military or strategic items could be donated." *Id.* To emphasize that the phrase "food, clothing, and medicine" was meant "only to be illustrative" and not interpreted as "excluding other donated things of value," he proposed that the term "including" be changed to "such as." *Id.* Both of these amendments were accepted by the House and Senate and enacted into law as § 1702(b)(2).

*Conclusion*

The meaning of § 1702(b)(2), when illuminated by its legislative history, is clear. The President has no authority to regulate or prohibit, directly or indirectly, donations by persons subject to the jurisdiction of the United States of articles, as distinguished from funds, which the donor intends to be used to relieve human suffering if the arti-

cles can reasonably be expected to serve that purpose.

Having so declared, the Court finds it useful to add these concluding comments. First, the statutory restriction on the Executive's authority was placed there by the Congress, not by this Court. While it may have been tidier had Congress provided that all humanitarian donations first be approved by the Executive, Congress did not do so. If the Congress wishes to modify § 1702(b)(2), it can do so. Second, even as construed by the Court, the restriction on the Executive's authority is not great. The President still has broad power to regulate the entire field of commercial and financial transactions. Third, the exemption is further narrowed because it only applies to uncompensated donations, not to any transaction for profit. Fourth, to qualify for the humanitarian aid exemption, the donor must not only intend to relieve human suffering but the article must be "reasonably" expected to achieve that purpose. Courts have traditionally viewed "reasonableness" as an objective test, and the Government could challenge the reasonableness of a donor's claim in any given case. Fifth, the Government has the same power to investigate and charge alleged violations of this law as it would any other federal law. Violation of IEEPA carries a criminal sanction of 10 years in prison and a substantial fine,[1] or a civil penalty of up to $10,000.00. Finally, and most importantly, § 1702(b)(2) already allows the President to totally abolish the humanitarian aid exemption if he determines, among other things, that the exemption would seriously impair his ability to deal with the national emergency or would endanger the armed forces engaged in hostilities or in a situation where involvement in hostilities is imminent.

Declaratory judgment shall be entered for Plaintiffs.

DONE.

JUDGMENT

The Plaintiffs have requested declaratory judgment interpreting § 1702(b)(2) of the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.* For

---

**1.** IEEPA provides a fine of $50,000.00. § 1705. Because a violation of the Act would be a felony, however, the maximum fine would be $250,-

000 for an individual and $500,000 for an organization. 18 U.S.C. § 3571(b)(3) and (c)(3).

reasons detailed in a Memorandum Opinion signed this day, it is now DECLARED that:

1. The President of the United States has no authority to regulate or prohibit, directly or indirectly, donations to a foreign country by persons subject to the jurisdiction of the United States of articles, as distinguished from funds, which the donor intends to be used to relieve human suffering and which articles can reasonably be expected to serve that end.

2. Specifically, the Foreign Assets Control Office of the Department of Treasury, as an agent of the President, may not regulate or prohibit, directly or indirectly, such donations by requiring the donor to seek and obtain a license prior to exportation.

DONE.